**CATHOLIC HIGH SCHOOL ASSOCIATION OF the ARCHDIOCESE OF NEW YORK, Plaintiff,**

**v.**

**Edward R. CULVERT, Individually, and in his capacity as Chairman of the New York State Labor Relations Board, and the New York State Labor Relations Board, an Agency of the Department of Labor of the State of New York, Defendants,**

**and**

**Lay Faculty Association, Intervenor-Defendant.**

**No. 82 Civ. 396 (MEL).**

United States District Court, S.D. New York.

Nov. 8, 1983.

Clifton, Budd, Burke & DeMaria, New York City, for plaintiff; Edward J. Burke, Robert A. Wiesen, Richard K. Muser, New York City, of counsel.

Robert Abrams, Atty. Gen., State of N.Y., New York City, for defendants; Evelyn Tenenbaum, Asst. Atty. Gen., New York City, of counsel.

Suozzi, English & Cianciulli, P.C., Mineola, N.Y., for intervenor-defendant; Robert M. Archer, Stephen C. Glasser, Leonard J. Shore, Mineola, N.Y., of counsel.

LASKER, District Judge.

This case poses the question whether the New York State Labor Board ("SLRB") may oversee labor relations involving parochial schools and lay teachers without violating the constitutional guarantees of religious freedom.[1] Both defendants and plaintiff move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff's summary judgment motion is granted and defendants' cross-motion is denied.[2]

## I.

The Catholic High School Association ("Association") manages and operates eleven Roman Catholic secondary schools within the Archdiocese of New York. It is a not-for-profit corporation organized under the New York State Education Law. The Association is governed by ten trustees, all of whom are officials in the Archdiocese of New York. In addition, the Association's officers are all Roman Catholic priests.

There is much evidence of the religious character of the schools operated by the Association. The parties have agreed that they are "church-operated" as that term was applied by the Supreme Court in *NLRB v. Catholic Bishop of Chicago*,[3] and the faculty handbooks of the schools are filled with references to their religious missions. For instance, the handbook for Cardinal Spellman High School describes Cardinal Spellman as:

"a Roman Catholic school dedicated to serving young men and women through a program of learning which emphasizes the essentials: personal Christian development as exemplified in the life and mission of Jesus mediated by the Church; the stimulation of innate creativity; the development of emotional maturity; and a sense of commitment to the Church, the community, the nation, the world." [4]

Similarly, among the objectives described in the Moore High School handbook is the following:

"We realize our philosophical beliefs within the framework of a Catholic environment. Thus we hold as important:

1. to provide our students with a knowledge of their religious heritage by offering a course of study based on the Gospel of Jesus Christ.

2. to make available religious services and observances.

3. to accept the sharing of corporate responsibility in implementing our philosophy and objectives." [5]

The faculty of the Association's schools consists of both lay and religious teachers. For example, there are three priests, thirteen Sisters of the Divine, and twenty-four lay teachers on the John F. Kennedy High School Faculty.[6] Lay faculty teach both secular and religious subjects, as do the priests and religious teachers, and they are intimately involved in the fulfillment of the pervasive religious purpose of the Association's schools.

The Lay Faculty Association ("LFA") is a labor organization which represents 343 lay teachers employed by the Association

---

1. U.S. Const. amend. I provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." This prohibition applies to the states as well. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

2. These motions were decided orally on October 7, 1983. This memorandum supplements that disposition.

3. 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

4. Affidavit of Father James K. Vaughey, Treasurer of the Catholic High School Association, filed July 7, 1982, at Exhibit E.

5. *Id.,* at Exhibit C.

6. *See id.,* Exhibit D.

as their exclusive certified bargaining representative. Its members are lay faculty only, and its by-laws preclude religious teachers from joining the union.[7]

In November 1980, the LFA filed with the SLRB charges alleging that the Association had engaged in unfair labor practices within the meaning of the New York State Labor Relations Act ("SLRA")[8] because it had allegedly discouraged membership in the LFA by writing letters to individual teachers and by suspending 226 teachers for protesting the Association's implementation of a new teacher substitution policy. Following an SLRB investigation into these allegations, the Association was served with a formal unfair labor practice complaint on December 11, 1981. The Association then commenced this action seeking a declaratory judgment and an injunction against the SLRB on the grounds that the SLRA's assertion of jurisdiction over the Association violates the First Amendment's religion clauses and that the National Labor Relations Act ("NLRA")[9] preempts state action in this area.

## II.

The Association initially asserts that because secular and religious aspects of education intermingle in its schools, the SLRA requirements of mandatory and good faith collective bargaining over a wide variety of subjects burden its free exercise of religion. The argument is that the mandatory bargaining provision[10] burdens religion because it limits the Association's power to make religious decisions that affect the administration of its schools.[11] Furthermore, it is claimed that the SLRB's power to investigate the good faith motives of Association decisions affecting lay teachers

also burdens religion. The Association argues that while state interests in public health and safety have on occasion been held sufficiently compelling to justify burdening religion, the state interests found here supporting the SLRA, namely, furthering peaceful labor relations and maintaining continuity in parochial school education, are insufficient to legitimize infringement of the Association's First Amendment rights.

The SLRA is also unconstitutional as applied to parochial school teachers, in the Association's view, because of the likelihood that the Act will produce excessive church-state entanglement contrary to the demands of the establishment clause. The kinds of inquiries that the SLRB will be called upon to make in order to determine whether the Association's actions have been taken in good faith will create an entangling relationship between church and state, according to the Association. One illustration which the Association provides, in support of its assertion that the SLRA burdens its conduct but which arguably also supports an excessive entanglement claim, is that of a lay teacher LFA member who might be discharged for advocating birth control or abortion in the classroom. According to the Association, this discharge could lead to an SLRB inquiry into Catholic Church doctrinal matters in order to ascertain whether the discharge was motivated by genuine religious belief or whether religion was simply being used as a pretext for discouraging LFA membership.[12]

The Association further argues that it is entitled to summary judgment because the NLRA preempts states from acting in this

---

7. See Affidavit of Henry Kielkucki, President of the Lay Faculty Association, filed November 3, 1982, at ¶¶ 6–7.

8. N.Y.LAB.LAW §§ 700–717 (McKinney 1977).

9. 29 U.S.C. §§ 151–169 (1976).

10. See N.Y.LAB.LAW § 705(1) (McKinney 1977).

11. The Association claims that "[t]he duty to bargain would require the Association to negotiate with the union if it wished to replace any lay faculty members with a priest or a religious faculty member. This duty would foreclose the school authorities from entering into such negotiations with a fixed determination to accomplish the change." Plaintiff's Memorandum in Support of its Motion for Summary Judgment, filed July 7, 1982, at 13.

12. See id., at 15.

area unless Congress or the NLRB has specifically ceded jurisdiction. Since this has not occurred, the Association asserts that preemption ought to apply.

In furtherance of their own summary judgment motion, the SLRB and its Chairman contend that the SLRA is not unconstitutional as applied to parochial school teachers because the Act's procedures, requiring simply that the employer bargain in good faith, and SLRB practices, which entail only an examination of the secular issue of whether the Association has engaged in anti-union conduct, collectively impose merely incidental burdens upon religion and are justified by compelling state interests.[13]

Defendants further claim that this case presents no establishment clause difficulties because the SLRA possesses a secular purpose and a primary effect that neither advances nor inhibits religion. They also argue that the Act does not produce excessive church-state entanglement because, in contrast to Supreme Court cases finding state aid to parochial schools unconstitutional, "the application of the SLRA to parochial schools neither involves the payment of funds nor obliges the SLRB to monitor the schools' religious activities."[14]

Finally, defendants assert that this case does not meet the case or controversy requirement of Article III of the Constitution and is not ripe for federal judicial review.[15] They state that the SLRB has never processed a claim involving parochial school teachers in which religion clause issues have been raised and that the pending SLRB proceedings that have led to this action do not involve religious issues or defenses. Accordingly, the mere possibili-

ty that a religious issue might arise in a future case, it is claimed, does not justify deciding First Amendment issues here.

The LFA, as intervenor-defendant, argues that this case presents no establishment clause problems because the collective bargaining agreement between the LFA and the Association specifically limits the range of negotiable issues to secular matters. As a result, according to the LFA, there is no possibility of excessive entanglement between church and state.

## III.

### A. Justiciability

■ At the outset, it is necessary to address the threshold question whether a case or controversy ripe for judicial review exists. The case or controversy clause of Article III of the Constitution requires the plaintiff (Association) to raise concrete legal issues by showing that its injury, or the threat of injury, is "real and immediate" and not simply "conjectural" or "hypothetical."[16]

■ The Association has met the required burden in this case through its assertions that application of the SLRA to parochial school teachers is proscribed by the religion clauses. In *NLRB v. Catholic Bishop of Chicago*,[17] the Supreme Court forcefully articulated the reality of the threat of constitutional injury presented here. In that case, the Catholic Bishop of Chicago and the Catholic Diocese of Fort Wayne-South Bend challenged the National Labor Relations Board's ("NLRB") assertion of jurisdiction over lay teacher-parochial school labor relations on constitutional and statutory grounds. The Court ob-

---

**13.** These interests are alleged to grow out of the SLRA's purpose of preventing teacher strikes which might (1) "affect the goodwill, credibility, and trust that must be present between teachers and administrators and among teachers in order to maintain a productive environment in the schools"; (2) "affect the goodwill of the neighborhood toward the schools and may cost local governments extra money should more police become necessary"; and (3) disrupt the education of students enrolled in New York State Roman Catholic schools. Defendants' Memorandum of Law, filed Nov. 24, 1982, at 26.

**14.** *Id.,* at 32.

**15.** *See* U.S. Const. art. III, § 2.

**16.** *See O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Golden v. Zwickler* 394 U.S. 103, 108–110, 89 S.Ct. 956, 959–61, 22 L.Ed.2d 113 (1969).

**17.** 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

served that, based upon the evidence of inquiries by the NLRB into parochial school affairs, there existed "abundant evidence that the Board's assertion of jurisdiction in church-operated schools would implicate the guarantees of the Religion Clauses."[18]

Moreover, as stated by the Court of Appeals for the Seventh Circuit in its review of the facts presented in *Catholic Bishop:*

"The whole tenor of the [Supreme Court's] Religion Clause cases involving state aid to schools is that there does not have to be an actual trial run to determine whether the aid can be segregated, received and retained as to secular activities only but it is sufficient to strike the aid down that a reasonable likelihood or possibility of entanglement exists."[19]

The message of the Supreme Court's establishment clause opinions is that courts ought not wait for actual conflict over state sponsorship or inhibition of religion to arise.[20] The First Amendment was drafted with sharp recognition that state promotion of religion had led to successive waves of civil strife in Europe and colonial America.[21] Furthermore, Supreme Court interpretation of the requirement of church-state separation has been greatly influenced by James Madison's argument that even minor state promotions of religion are impermissible because they rest on the same continuum as state-sanctioned religious persecutions.[22] Accordingly, while the type of state inhibition in question here may be minimal, the threat of injury is sufficiently real and imminent to constitute a justiciable case or controversy.

## B. *Constitutional Issues*

### 1. *Relevant Precedent*

Resolution of the constitutional issues presented here is made easier by the thoughtful analysis contained in opinions of the Supreme Court and the Seventh Circuit in *Catholic Bishop.*[23] There, the Seventh Circuit found that the National Labor Relations Act violated the religion clauses of the First Amendment when applied to parochial school teachers.[24] The Supreme Court affirmed on statutory grounds only, holding the NLRB's assertion of jurisdiction invalid in light of the absence of a clear expression of Congressional intent to bring parochial school teachers within the jurisdiction of the NLRA.[25] The Court did note, however, that "serious First Amend-

---

**18.** *Id.,* 440 U.S. at 507, 99 S.Ct. at 1322. The Court did not reach the question of the constitutionality of such a regulatory scheme. Instead, it held that Congress did not clearly express its intent to bring teachers in church-operated schools within the coverage of the NLRA. *See id.*

**19.** *Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112, 1126 (7th Cir.1977), *aff'd on other grounds,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

**20.** *See Lemon v. Kurtzman,* 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971) ("Further difficulties [in maintaining church-state separation] are inherent in the combination of religious discipline and the *possibility* of disagreement between teacher and religious authorities over meaning of the statutory restrictions.") (emphasis added); *Walz v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) ("Elimination of [a tax] exemption [for religious institutions] would *tend* to expand the involvement of government" in religious affairs.) (emphasis added).

**21.** *See* J. Madison, *Memorial and Remonstrance Against Religious Assessments* ¶ 7, *reprinted in*

*Everson v. Bd. of Educ.,* 330 U.S. at 67, 67 S.Ct. at 536 (Rutledge, J. dissenting).

**22.** *See, e.g., Everson v. Bd. of Educ.,* 330 U.S. at 8–16, 67 S.Ct. at 512. As Madison pointed out in opposing such forms of state assistance: "Distant as it may be, in its present form, from the Inquisition it differs from it only in degree. The one is the first step, the other the last in the career of intolerance." Madison, *supra* note 20, at ¶ 9, *reprinted in id.,* 330 U.S. at 68–69, 67 S.Ct. at 537.

**23.** *See Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112 (7th Cir.1977), *aff'd on other grounds,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

**24.** *See id.,* 559 F.2d at 1131. The court based its holding jointly upon the establishment and free exercise clauses because each "has the identical purpose of maintaining a separation between Church and State." *Id.*

**25.** *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 507, 99 S.Ct. at 1322.

ment questions would follow" if the NLRB were to have been found to have jurisdiction over parochial schools.[26]

Thus, except for the fact that we deal here with the assertion of jurisdiction over parochial school teachers by the State rather than the National Labor Relations Board, this case raises issues identical to those in *Catholic Bishop*. Unlike the facts of *Catholic Bishop*, however, there is no question that the New York statute covers and is intended to cover parochial school-lay teacher labor relations. While the Act does not specify that its jurisdiction extends to such teachers, the intent to extend such coverage is established by the fact that the statute was specifically amended to remove employees of religious institutions from the list of workers excluded from coverage.[27] Accordingly, the constitutional issue is squarely before us.

Among the multitude of Supreme Court decisions interpreting the parameters of the religion clauses, the outcome of this case is particularly influenced by those opinions that have addressed the constitutionality of state aid to parochial schools. While the holdings of those cases are not entirely consistent, as evidenced by the Court's willingness to permit state subsidies for testing, textbooks, transportation and tuition in the form of tax credits,[28] but not for counseling, school maintenance and repair, tuition reimbursement, and teacher salaries,[29] the Court has made clear that it finds teaching in parochial schools may very often involve both secular and religious elements. As noted by the Court in *Lemon v. Kurtzman:*

> "a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faith are not inculcated by neutrals. With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine. What would appear to some to be essential to good citizenship might well for others border on or constitute instruction in religion." [30]

Similarly, in *Meek v. Pittenger,* the Court stated that "[w]hether the subject is 'remedial reading,' 'advanced reading,' or simply 'reading,' a teacher remains a teacher, and the danger that religious doctrine will become intertwined with secular instruction persists." [31]

The Court's finding of an interrelationship between a parochial school teacher's secular and religious activities explains why it has so regularly invalidated state schemes which confer direct benefits upon teachers.[32] Such benefits necessarily produce excessive church-state entanglement of a kind that is prohibited by the establishment clause.[33] Similarly, in *Catholic Bishop*, the Court has suggested that when the state attempts to intervene into the sphere

---

**26.** *See id.,* 440 U.S. at 504, 99 S.Ct. at 1320.

**27.** In his message approving this amendment to the SLRA, then Governor Rockefeller stated: "This bill amends the Labor Law to guarantee to employees of charitable, religious and educational institutions the right of self-organization...." 1968 N.Y.Laws 2389.

**28.** *See, e.g., Mueller v. Allen,* — U.S. —, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); *Committee for Pub. Educ. & Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Board of Educ. v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Everson v. Board of Educ.,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

**29.** *See, e.g., Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Levitt v. Committee for Pub. Educ. & Religious Liberty,* 413

U.S. 472, 93 S.Ct. 2814, 37 L.Ed.2d 736 (1973); *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

**30.** *Lemon v. Kurtzman,* 403 U.S. at 618–9, 91 S.Ct. at 2114.

**31.** *Meek v. Pittenger,* 421 U.S. at 370, 95 S.Ct. at 1766; *see also Wolman v. Walter,* 433 U.S. at 244, 97 S.Ct. at 2603.

**32.** *See Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745.

**33.** *See id.,* 403 U.S. at 615–22, 91 S.Ct. at 2112–16.

of parochial school-teacher labor relations, similar excessive entanglement difficulties arise.

"Good intentions by government—or third parties—can surely no more avoid entanglement with the religious mission of the school in the setting of mandatory collective bargaining than in the well-motivated legislative efforts consented to by the church-operated schools which we found unacceptable in Lemon [*v. Kurtzman* ], Meek [*v. Pittenger* ] and *Wolman* [*v. Walter* ]." [34]

### 2. *Relevant Constitutional Standard*

Some courts have held that assertion of National Labor Relation Board jurisdiction over parochial school teachers is prohibited by both the free exercise and establishment clauses of the First Amendment.[35] A state measure would of course be unconstitutional if it failed to satisfy the demands of either clause. Because the SLRA's most obvious defect when applied to parochial school teachers is that it results in excessive church-state entanglement, it is unnecessary to determine whether the Act may also violate the free exercise clause.[36]

■ The establishment clause bars a state from promoting religion or adopting a hostile attitude towards religion. In order to meet the requirements of the clause, a statute must satisfy the test articulated in *Lemon v. Kurtzman.* "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion[;] finally, the statute must not foster 'an excessive entanglement with religion.' " [37] As indicated below, the SLRA's assertion of jurisdiction in the case at hand violates the establishment clause because it threatens to produce excessive entanglement between church and state.

### 3. *Application*

■ The facts of record persuasively demonstrate that substantial religious activity takes place in the schools managed and operated by the Association. The schools are governed by officers of the Catholic Archdiocese of New York, the Association's officers are all Roman Catholic priests, and a principal educational objective found in all of them is the promotion of spiritual belief. Consequently, as recognized by the Supreme Court and lower courts when presented with these facts, it is not possible to differentiate effectively between the secular education which these schools provide and their religious mission.[38]

Similar difficulties exist in attempting to identify separately the secular aspects of the work carried on by lay teachers. The record demonstrates that lay faculty instruct students in religious as well as secular subjects, and that they work alongside religious teachers while carrying out their daily routines. In this environment, it is to

---

**34.** *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 502, 99 S.Ct. at 1319.

**35.** *See Catholic Bishop of Chicago v. NLRB,* 559 F.2d 1112; *McCormick v. Hirsch,* 460 F.Supp. 1337 (M.D.Pa.1978); *Caulfield v. Hirsch,* 95 LRRM (BNA) 3164 (E.D.Pa.1977).

**36.** While free exercise considerations are not assessed in this case, a good argument may be made for using the free exercise clause to hold the SLRA unconstitutional as applied to parochial school teachers. *See* cases cited *supra* note 35.

**37.** *Lemon v. Kurtzman,* 403 U.S. at 612–613, 91 S.Ct. at 2111 (citations omitted). Although the Supreme Court has recently employed alternative establishment clause analyses in *Marsh v. Chambers,* —— U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) and *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982),

the *Lemon* test continues to be employed in establishment cases. *See Mueller v. Allen,* —— U.S. ——, ——, 103 S.Ct. 3062, 3067, 77 L.Ed.2d 721 (1983); *Larkin v. Grendel's Den,* —— U.S. ——, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982).

**38.** *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 503, 99 S.Ct. at 1320; *Roemer v. Board of Pub. Works,* 426 U.S. 736, 748–54, 96 S.Ct. 2337, 2345–49, 49 L.Ed.2d 179 (1976); *Meek v. Pittenger,* 412 U.S. at 349, 95 S.Ct. at 1755; *Levitt v. Committee for Pub. Educ. & Religious Liberty,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948; *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. at 798, 93 S.Ct. at 2978; *Lemon v. Kurtzman,* 403 U.S. at 657, 91 S.Ct. at 2133; *Catholic Bishop of Chicago v. NLRB,* 559 F.2d at 1119; *McCormick v. Hirsch,* 460 F.Supp. at 1352; *Caulfield v. Hirsch,* 95 LRRM (BNA) at 3176.

be expected that, as the Supreme Court has recognized, religious doctrine will mix with secular instruction.[39] It follows also that there is reasonable likelihood that any state program which closely monitors the conditions of lay faculty employment will result in unacceptable church-state entanglement.

The SLRA provides for mandatory collective bargaining between the employer and the employees' designated representative over "rates of pay, wages, hours of employment, or other conditions of employment."[40] While defendants argue that the Act merely requires the Association to bargain in good faith on these subjects, the Association answers cogently that negotiations over "other conditions of employment" and SLRB scrutiny of Association decisions to ascertain whether they were made in good faith may well lead to excessive administrative entanglement between church and state.

In light of the pervasively religious character of the Association's schools, there is a real threat that religious subjects will become part of the LFA-Association bargaining process as a result of SLRA requirements. The Association persuasively quotes an authority on faculty collective bargaining matters who describes the expansive nature of the negotiation process:

"Once a bargaining agent has the weight of statutory certification behind it, a familiar process comes into play. First, the matter of salaries is linked to the matter of workload; workload is then related directly to class size, class size to range of offerings, and range of offerings to curricular policy. Dispute over class size may also lead to bargaining over admissions policies. This transmu-

tation of academic policy into employment terms is not inevitable, but it is quite likely to occur."[41]

This excerpt illustrates how real is the possibility that the statutory imposition of bargaining requirements on a parochial school system can lead to negotiation over religious matters when, as here, religion plays an integral role within overall academic policy. Moreover, when the likely effects of the SLRA mandatory bargaining provision are considered in conjunction with the Act's grant of authority to the SLRB to make investigations into the good faith of the Association's bargaining position and employment decisions, problems of entanglement appear to be an imminent possibility.

The hypothetical case described above of the lay teacher discharged for advocating abortion and birth control contrary to Catholic Church doctrine vividly illustrates the nature of the entanglement threat. In such a situation, it is reasonable to expect that the SLRB might scrutinize Catholic doctrine to determine whether the Association's motive for firing the offending teacher was legitimate.[42] Such an investigation by a state agency would clearly constitute impermissible entanglement.[43]

The Supreme Court noted in *Catholic Bishop* the First Amendment problems that would arise if the NLRB were permitted under the National Labor Relations Act to investigate parochial school-lay teacher labor relations: "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions."[44] The Court's analysis ap-

---

**39.** *See supra* text accompanying notes 30–34.

**40.** N.Y.LAB.LAW § 705(1) (McKinney 1977).

**41.** Brown, *Collective Bargaining in Higher Education,* 67 Mich.L.Rev. 1067, 1075 (1969) (footnote omitted), *quoted in Catholic Bishop of Chicago v. NLRB,* 559 F.2d at 1123; *McCormick v. Hirsch,* 460 F.Supp. at 1354; *Caulfield v. Hirsch,* 95 LRRM (BNA) at 3177.

**42.** *See, e.g., Nazareth Regional High School v. NLRB,* 549 F.2d 873, 882 (2d Cir.1977) (teacher's

failure to conform teaching to Catholic Church doctrine raised as an issue).

**43.** It is also possible that the state places an unconstitutional burden upon religion by conducting such inquiries, although this issue is not considered here. *See supra* note 36 and accompanying text.

**44.** *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 502, 99 S.Ct. at 1320.

**1558**

plies with equal force to the case at hand. It is true that not all inquiries by the state into religious affairs need necessarily lead to a finding of excessive church-state entanglement,[45] but the Constitution does limit the kind and degree of state scrutiny of religious practices.[46]

Contrary to the LFA's argument, these difficulties are not remedied by the limitation of subjects of bargaining specified in the LFA-Association agreement. Private agreements cannot affect the power of a state agency such as the SLRB to conduct statutorily authorized investigations. An SLRB examination into whether the Association has acted in good faith in its dealings with the LFA may reach religious matters regardless of the terms of agreement between the parties.

Finally, for two related reasons that have been discussed above in different contexts, the Association's argument that the NLRA preempts the SLRA from asserting jurisdiction over parochial school is determined to be without merit. In *Catholic Bishop,* the Supreme Court held that the NLRA did not apply to parochial school teachers.[47] In addition, New York State specifically intended to bring lay teachers within the coverage of the SLRA.[48] It is therefore appropriate that we reach the constitutional issues presented here.[49]

Plaintiff's motion for summary judgment is granted and defendants' cross motion for summary judgment is denied.

Submit judgment on notice.

---

**45.** *See Wisconsin v. Yoder,* 406 U.S. 205, 222–29, 92 S.Ct. 1526, 1536–40, 32 L.Ed.2d 15 (1972); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C. 1968) (extrinsic evidence employed to support holding Neo-American church to be not an established church).

**46.** *See Wisconsin v. Yoder,* 406 U.S. at 215, 92 S.Ct. at 1533 ("a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question"); L. Tribe, *American Constitutional Law* § 14–11, at 861 (1978).

**47.** *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 507, 99 S.Ct. at 1322.

**48.** *See supra* note 24 and accompanying text.

**49.** Whether the SLRA is unconstitutional as applied to other lay employees of parochial schools or other religious institutions remains an open question. *Cf. Whitney v. Greater N.Y. Corp. of Seventh Day,* 401 F.Supp. 1363, 1367–68 (S.D.N.Y.1975).