CATHOLIC HIGH SCHOOL ASSOCIA-
TION OF the ARCHDIOCESE OF
NEW YORK, Plaintiff-Appellee-Cross-
Appellant,

v.

Edward R. CULVERT, Individually, and
in his capacity as Chairman of the New
York State Labor Relations Board, an
Agency of the Department of Labor of
the State of New York, Defendants-Ap-
pellants-Cross-Appellees,

and

Lay Faculty Association, Intervenor-
Defendant-Appellant-Cross-Appellee.

Nos. 1254, 1258, 1259, Dockets 83–9013,
84–7155, 84–7173.

United States Court of Appeals,
Second Circuit.

Argued May 16, 1984.

Decided Jan. 10, 1985.

Jeffrey G. Stark, Mineola, N.Y. (Robert M. Archer, Michael A. Ciaffa, Anne C. Pollaro, Law Office of Suozzi, English & Cianciulli, Mineola, N.Y., of counsel), for intervenor-defendant-appellant-cross-appellee.

Edward J. Burke, New York City (Robert A. Wiesen, Richard K. Muser, Law Office of Clifton, Budd, Burke & DeMaria, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Evelyn M. Tenenbaum, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Stanley A. Camhi, Asst. Atty. Gen., New York City, of counsel), for defendants-appellants-cross-appellees.

Before CARDAMONE, PRATT and FRIEDMAN,* Circuit Judges.

CARDAMONE, Circuit Judge:

This appeal presents delicate issues involving the relationship between church and state. Since the drafting of the Bill of Rights, government regulation has become increasingly expansive. The wall of the First Amendment delineates the permissible degree of this government intrusion into the sphere reserved for religion. This parchment barrier must be constantly manned, the Founding Fathers believed,

---

* Honorable Daniel M. Friedman, United States Circuit Judge for the Federal Circuit, sitting by designation.

lest there be a union between church and state that will first degrade and eventually destroy both. The issue in this case is whether the Religion Clauses of the First Amendment made applicable to the states by the Fourteenth Amendment prohibit the New York State Labor Relations Board from exercising jurisdiction over the labor relations between parochial schools and their lay teachers. This "difficult and sensitive" question, expressly left open by the Supreme Court in *NLRB v. Catholic Bishop*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), *aff'g on other grounds*, 559 F.2d 1112 (7th Cir.1977), is one of first impression in this Circuit. Our task is to determine whether there is a principled basis upon which to limit state intrusion to secular aims.

## I

The New York State Labor Relations Board (State Board or Board) administers the New York State Labor Relations Act (SLRA or Act). As originally enacted in 1937 the Act's provisions did not apply to employees of charitable, educational or religious associations and corporations. In 1968 the Act was amended to bring these employees within its scope. The next year the Lay Faculty Association (Union), the defendant-intervenor in this case, petitioned the State Board for certification as the exclusive bargaining representative of the teachers in the eleven schools managed and operated by the plaintiff Catholic High School Association (Association). The Association voluntarily assisted the Union in holding an election in which the lay teachers voted to be represented by the Union, which was then certified by the Board.

The parties agree that the schools are "church-operated" within the meaning of *Catholic Bishop*. The faculty of the Association is composed of both lay and religious teachers, all of whom are directly involved in the transmission of religious values to the students. From 1969 to 1980 the Union and the Association entered into a series of collective bargaining agreements governing the secular terms and conditions of lay teachers' employment. The by-laws of the Union specifically exclude religious faculty, and each of the agreements was expressly limited to nonreligious issues.[1] The Association has never claimed that these agreements violate the religious mission of the schools, and until now it has never challenged the Board's jurisdiction.

In 1980, while the Union and the Association were negotiating a new contract, the Union filed unfair labor practice charges against the Association for the first time. The charges alleged that the Association had violated sections 704(5) and (10) of the State Labor Relations Act. The Union claimed that the Association had discouraged membership in the Union by suspending 226 teachers who had protested the Association's unilateral implementation of a substitution policy that required teachers to teach, in addition to their own, the classes of absent teachers. The Union also alleged that the Association wrote letters to individual teachers urging them to pressure the Union into accepting the Association's offers, discouraged support for the Union by referring to the futility of its efforts, and announced other changes in working conditions that the Association

---

1. The preamble of the Collective Bargaining Agreement between the Association and the Union stated:

 [T]he Union and its members recognize the uniqueness of the Employer and its member schools in that it is a Roman Catholic school system committed to provide education within the framework of Catholic principles and that nothing in this Agreement shall be construed as interfering in any way with the [Association] in carrying out [its] functions and duties that are canonical, ecclesiastical, or religious in nature; and

 753 F.2d—27

[T]he Union and its members further recognize that the functions and duties referred to hereinabove are not subject to the grievance, discharge, termination or other provisions of this Agreement.

Moreover, a rider to the agreement stated "there are certain areas of Canon Law, ecclesiastical decrees and religious obligations that cannot be the subject of negotiations." It further provided, for example, that "if a teacher were to teach that there was no God" then "he could be discharged ... and the discharge would not be subject to the discharge grievance procedure."

would make unilaterally. None of these charges raised a religious issue and the Association is not contending that it took these actions because of its religious beliefs.

After the Union filed these charges, the Board conducted an informal confidential investigation to determine whether the Union had a *prima facie* case. The investigation was limited to determining the content of the letters and to whom they were mailed, and to ascertaining whether the suspensions were intended to discourage union membership. As a result of its investigation the Board issued a formal complaint. The Association immediately brought an action seeking a declaratory judgment and injunctive relief against the State Board. It challenged the State Board's assertion of jurisdiction, alleging that it violates the Religion Clauses of the First Amendment and that jurisdiction by the Board over lay teachers in church-operated schools is preempted by the National Labor Relations Act. At a conference in the district court judge's chambers, the Association agreed to file a motion for summary judgment after it received the defendant State Board's answer to its complaint and stipulated that the Union would be permitted to intervene. The Union and the Board opposed the Association's motion for summary judgment and the Board cross-moved. The Association's motion was granted by United States District Judge Morris E. Lasker upon his conclusion that the State Board's assertion of jurisdiction violated the Establishment Clause. The district court enjoined the Board from continuing its proceedings against the Association.

The virtually identical issue was presented but left unresolved in *Catholic Bishop*. There a closely-divided Supreme Court held that the National Labor Relations Board (NLRB) lacked jurisdiction over lay teachers because Congress had not affirmatively indicated that it intended them to be covered by the National Labor Relations Act (NLRA). Since there is such a clear statement of legislative intent in this case, the district court concluded that it must decide the constitutional question.

At the outset the district court held that First Amendment claims raised in the Association's complaint were justiciable. 573 F.Supp. 1550, 1553–54 (S.D.N.Y.1983). It based this holding on a finding that the "threat of injury" to the Association's religious freedoms was "sufficiently real and imminent to constitute a justiciable case or controversy." *Id.* at 1554. Judge Lasker then reached the First Amendment issues and held that application of the Act to lay teachers violated the Establishment Clause because it "threatens to produce excessive entanglement between church and state." *Id.* at 1556. He found that the threat of entanglement arises because the Act's good faith bargaining requirement might "lead to negotiation over religious matters" and because the State Board has the power to investigate unfair labor practice charges in the course of which religious issues might arise. *Id.* at 1557. He specifically limited his holding to lay teachers, as opposed to other church employees, *id.* at 1558 n. 49, and found it unnecessary to rule on the Association's free exercise claim. *Id.* at 1556 n. 36.

The district court also held that limitations in the collective bargaining agreement would not cure the conflict with the Establishment Clause. It found that an "SLRB examination into whether the Association has acted in good faith in its dealings with the [Union] may reach religious matters regardless of the terms of agreement between the parties." *Id.* at 1558. Finally, Judge Lasker held that the NLRA does not preempt the State Board from asserting jurisdiction over parochial schools. This holding was based on his finding that the NLRA does not apply to parochial school teachers. The Board and Union appeal from the district court's determination that the Board's assertion of jurisdiction is unconstitutional, and the Association cross-appeals the district court's holding that the Board's jurisdiction is not preempted by the NLRA.

## II

■ We begin by considering the Union's and the State's contention that the Association's First Amendment claims fail to meet the threshold "case or controversy" requirement of Article III of the Constitution.[2] The Board and Union argue that during the fourteen years that the Act's provisions have applied to church-operated schools, the Board has handled many representation and unfair labor practice proceedings involving lay teachers at parochial schools and none of these cases have involved a religious question or have required it to inquire into or interfere with religious beliefs.[3] In contending that there must be a factual record developed before a court strikes down the assertion of a state agency's jurisdiction as unconstitutional, appellants rely on *Associated Press v. National Labor Relations Board*, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937), which involved a freedom of the press challenge to NLRB jurisdiction over newspapers. The Supreme Court there explained that "[c]ourts deal with cases upon the basis of the facts disclosed, never with nonexistent and assumed circumstances." *Id.* at 132, 57 S.Ct. at 655. The Association responds that permitting jurisdiction over its labor relations with its teachers would *necessarily* implicate the Religion Clauses. The Association asserts that the Seventh Circuit considered and properly dismissed the argument raised by the Union and the Board when it stated:

> The whole tenor of the Religion Clauses cases involving state aid to schools is that there does not have to be an actual trial run to determine whether the aid can be segregated, received and retained as to secular activities but it is sufficient to strike the aid down that a reasonable likelihood or possibility of entanglement exists.

*Catholic Bishop*, 559 F.2d at 1126.

■ We agree with the Association. The Supreme Court, affirming the Seventh Circuit on other grounds, distinguished *Associated Press* and commented that "the record affords abundant evidence that the Board's exercise of jurisdiction over teachers in church-operated schools would implicate the guarantees of the Religion Clauses." *Catholic Bishop*, 440 U.S. at 507, 99 S.Ct. at 1322. Moreover, in *Felton v. Secretary of Education*, 739 F.2d 48 (2d Cir.), *hearing pending*, —— U.S. ——, 105 S.Ct. 241 (1984), we struck down a provision that gave parochial schools in disadvantaged areas the services of public school teachers. Under the facts of that case we could find no principled basis to limit the state intrusion to secular aims. *Id.* at 66–67. We considered that case although there was no

---

2. As a threshold matter, we must decide whether the National Labor Relations Act preempts the State Board's jurisdiction. We hold that it does not. If *Catholic Bishop* had held that teachers are within the jurisdiction granted by the NLRA but are not "employees" within the meaning of that Act, the State Board would plainly be preempted from exercising jurisdiction. *See Bethlehem Steel Co. v. New York State Labor Relations Board*, 330 U.S. 767, 780, 67 S.Ct. 1026, 1033, 91 L.Ed. 1234 (1947) (Frankfurter, J. concurring); *NLRB v. Committee of Interns and Residents*, 566 F.2d 810 (2d Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1449, 55 L.Ed.2d 495 (1978). But *Catholic Bishop* held merely that the NLRB did not have jurisdiction over lay teachers because there was no clear statement that Congress had intended to cover them. 440 U.S. at 506–07, 99 S.Ct. at 1321–32. The *Catholic Bishop* Court stated that absent such affirmative indication, the NLRB had no jurisdiction because of the "difficult and sensitive" issues that would be raised in light of a teacher's critical role in the religious mission of the school. *Id.* at 507, 99 S.Ct. at 1322. Thus, this case is unlike *Committee of Interns and Residents* in which the NLRB retained jurisdiction over the employer, but deemed residents and interns not to be employees within the meaning of the Act. In this case the State Board has validly asserted jurisdiction because Congress did not indicate that the NLRB had jurisdiction.

3. Appellants further urge that the district court was incorrect in presuming that the Act presented the same threat of entanglement found to exist under the NLRA by the Seventh Circuit. But there is no dispute that the Act is in fact patterned after the NLRA, and appellants point to no differences in interpretation material to the entanglement threat. *See generally* K. Hanslowe, *Procedures and Policies of the New York State Labor Relations Board* 9–14 (1964) (comparison with National Act).

record evidence that the aid fostered religion, *id.* at 67, and explained:

> In our view, the Court has been wise in relying upon its reasoned apprehension of potentials rather than sanctioning case-by-case determinations of the precise level of risk. of fostering religion, since such an empirical approach would inevitably lead to increased litigation in an area where some degree of certainty is needed to prevent constant controversy.

*Id.* at 66. For the same reasons a justiciable controversy exists in this case. If we allow the camel to stick its nose into the constitutionally protected tent of religion, what will follow may not always be controlled. Thus, we must now turn to the question of whether the camel can be kept firmly tethered outside.

## III

The First Amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." Under the facts of this case, the claims under the Establishment Clause and the Free Exercise Clause involve the same considerations and are not easily divided and put into separate pigeon holes. Nonetheless, for organizational purposes, we will discuss the clauses independently of each other.

We. turn first to the Association's argument that the State's assertion of jurisdiction violates the Establishment Clause. The Supreme Court has made it clear, when discussing the Establishment Clause, that "total separation is not possible in an absolute sense, [for s]ome relationship between government and religious organizations is inevitable." *Lemon v. Kurtzman,* 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). It explained that "the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending upon all the circumstances of a particular relationship." *Id.* The Court has often found it useful to use the familiar three-pronged test in determining whether there has been a violation of the Establishment Clause.

[1] [W]hether the challenged law or conduct has a secular purpose, [2] whether its principal or primary effect is to advance or inhibit religion, and [3] whether it creates an excessive entanglement of government with religion.

*Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984). The parties do not dispute that the Act has a secular purpose and that its primary effect is not to advance or inhibit religion. Nonetheless, the district court found that assertion of jurisdiction under the Act violates the Establishment Clause because it threatens to produce an excessive administrative entanglement of government with religion.

The court below reached this conclusion by relying on two aspects of State Board oversight. First, it found that there was an "imminent possibility" that the Association would be required to bargain with lay teachers on religious subjects. Second, it found that in the event of an alleged unlawful discharge, the State Board might have to determine whether an asserted religious reason was a valid part of church doctrine. With respect to the degree of entanglement that results from the duty to bargain over secular terms and conditions of employment, the district court misapprehended the degree of supervision that the duty to bargain entails, and the nature of the state intrusion into the bargaining process. With respect to unlawful discharges, a recent Supreme Court ruling reveals a principled basis for an accommodation in the relationship between church and state.

■ We begin our analysis by examining the Association's duty to bargain. The State Board's relationship with the religious schools over mandatory subjects of bargaining does not involve the degree of "surveillance" necessary to find excessive administrative entanglement. In the three key Supreme Court cases addressing excessive administrative entanglement, *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217

(1975), and *Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); states attempted to provide aid to support certain secular aspects of classroom instruction in parochial schools. In these three cases the Supreme Court held that the aid resulted in excessive administrative entanglement, finding that the restrictions imposed to ensure secular use of the funds would inevitably require "comprehensive, discriminating, and continuing state surveillance." *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114; *Meek*, 421 U.S. at 370, 95 S.Ct. at 1765; *Wolman*, 433 U.S. at 254, 97 S.Ct. at 2608. This is quite unlike the situation here where the State Board's supervision over the collective bargaining process is neither comprehensive nor continuing.

Further, it has been held, for example, that although application of Title VII of the Civil Rights Act to lay teachers at a religious college would often involve "a wide ranging investigation into many aspects of the College's hiring practices," such supervision did not constitute "ongoing interference with the College's religious practices." *EEOC v. Mississippi College*, 626 F.2d 477, 487–88 (5th Cir.1980). State Board procedures are no more intrusive for these purposes than EEOC procedures. First, an employer's good faith is put in issue only if a union or individual brings a charge; the State Board itself cannot initiate an unfair labor practice proceeding. In this case, the record demonstrates that the Union had not brought a charge during a decade of collective bargaining. Second, the ten unfair labor practices specified in § 704 of the Act are entirely secular. Third, a labor relations examiner must limit investigation to those issues that pertain directly to the unfair labor practices set forth in the charge. The Administrative Law Judge must similarly limit the inquiry if there is a hearing. Finally, an order issued by the State Board is not self-enforcing. A "church-operated" school believing itself aggrieved by such an order may refuse to comply and raise a First Amendment defense when and if the Board seeks judicial enforcement of its order.

The Association relies, as did the Seventh Circuit in *Catholic Bishop*, on a passage from an article on collective bargaining in colleges and universities:

> Once a bargaining agent has the weight of statutory certification behind it, a familiar process comes into play. First, the matter of salaries is linked to the matter of workload; workload is then related directly to class size, class size to range of offerings, and range of offerings, to curricular policy .... This transmutation of academic policy into employment terms is not inevitable, but it is quite likely to occur.

Brown, *Collective Bargaining in Higher Education*, 67 Mich.L.Rev. 1067, 1075 (1969) (footnote omitted).

■ We decline to follow the Seventh Circuit down this slippery slope. Although this passage may accurately describe the bargaining process, the conclusion that the state is inevitably forced to become involved in all of these issues misconceives the State's role in that process. ·It is a fundamental tenet of the regulation of collective bargaining that government brings private parties to the bargaining table and then leaves them alone to work through their problems. The government cannot compel the parties to agree on specific terms. All it can do is order an employer who refuses to bargain in good faith to return and bargain on the mandatory bargaining subjects, all of which are secular. The Association apparently argues that it is the "Lilliputian bonds" that emanate from informed persuasion at the bargaining table that lead to entanglement between church and state. *See Cox, The Duty to Bargain in Good Faith*, 71 Harv. L.Rev. 1401, 1409 (1958). In effect the Association contends that the state would be compelling it to do something that it must choose to do voluntarily or not at all. But as the Fifth Circuit stated in *EEOC v. Mississippi*: "That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus

purely of ecclesiastical concern." 626 F.2d at 485. Thus, the duty to bargain does not involve excessive administrative entanglement between church and state.

The second ground for the district court's finding of excessive administrative entanglement was that the State Board's jurisdiction would require it to determine the validity of asserted religious motives as part of church doctrine. Thus, were a teacher who marries a non-Catholic to refuse to agree to raise her children Catholic and later be fired, the Board, in determining whether the asserted reason for discharge was pretextual, would have to decide whether requiring such an agreement was part of church dogma. The Board and Union urge that the Board would have no reason to inquire into the content or validity of church doctrine. They argue that courts and administrative agencies often have been called upon to determine whether religious beliefs are sincere. In *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), for example, the Supreme Court found that when an individual asks for a draft exemption on religious grounds, the local draft board and the Court are to "decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious." *Id.* at 185, 85 S.Ct. at 863.

■ In the present case it is not the inquiry into whether a belief is sincerely held by an individual that is at issue. Rather, it is the possibility of recurrent questioning of whether a particular church actually holds a particular belief. We agree with the Seventh Circuit that in order to demonstrate the sincerity of the belief held, "the bishop ... would have to eliminate the pretextual aspect of claimed justification which would involve the matter of showing the validity [as part of church doctrine] of the claimed doctrinal position advanced." *Catholic Bishop*, 559 F.2d at 1129. Inevitably this would lead to the degradation of religion. One of the primary purposes of the Establishment Clause was to avoid just this result. Thus,

the First Amendment prohibits the State Board from inquiring into an asserted religious motive to determine whether it is pretextual.

■ The question remains whether this limitation of the State Board's powers should preclude it from asserting jurisdiction. We think not. The Board does not become "a toothless tiger" because of this rein on its powers. It is still free to determine, using a dual motive analysis, whether the religious motive was in fact the cause of the discharge. *See, e.g., NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (asserted reason was not motivating cause because others had engaged in the same misconduct and had not been disciplined). Other circuits have made a similar accommodation by permitting the EEOC to assert jurisdiction but precluding it from determining whether an asserted reason is pretextual. *See, e.g., EEOC v. Mississippi College*, 626 F.2d at 485.

The Seventh Circuit considered and rejected such an accommodation stating:

"[T]he rule is well established that although ample valid grounds may exist for the discharge of an employee, that discharge will violate § 8(a)(3) if it was in fact motivated, even partially, by the employee's union activity."

. . . .

We fail to comprehend the real possibility of accommodation in the present context without someone's constitutional rights being violated which in turn would seem to preclude the possibility of accommodation as an answer to the obviation of the religious entanglement problem. *Catholic Bishop*, 559 F.2d at 1130 (quoting *NLRB v. The Pembeck Oil Corp.*, 404 F.2d 105, 109 (2d Cir.1968), *vacated on other grounds and remanded*, 395 U.S. 828, 89 S.Ct. 2125, 23 L.Ed.2d 737 (1969)). We agree with the Seventh Circuit that in cases involving lay faculty the Board should not be allowed to find a violation simply because anti-union animus motivat-

ed a discharge "in part." Nonetheless, we adopt the accommodation that the Seventh Circuit rejected. It is clear that the Supreme Court seeks to accommodate apparently irreconcilable interests in the labor area where possible. *See, e.g., NLRB v. Gissel Packing Co.,* 395 U.S. 575, 616–17, 89 S.Ct. 1918, 1941–42, 23 L.Ed.2d 547 (1969) (finding no First Amendment free speech right to commit unfair labor practice). Such an accommodation is possible in this case. The Board may—consistent with the First Amendment—protect teachers from unlawful discharge by limiting its finding of a violation of the collective bargaining agreement to those cases in which the teacher would not have been discharged "but for" the unlawful motivation. *See Transportation Management,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667. Were the Board allowed to apply an "in part" test in addressing an asserted religious motive, an order based on such a finding would violate the First Amendment. A parochial school might be forced to reinstate a teacher it otherwise would have fired for religious reasons simply because the school administration was also partly motivated by anti-union animus. To avoid this unconstitutional result, the Board therefore may order reinstatement of a lay teacher at a parochial school only if he or she would not have been fired otherwise for asserted religious reasons.

■ Where a principled basis exists, as it does here, to limit state aid to or regulation of parochial schools, an attempt should be made to accommodate the interests of church and state under the Establishment Clause. Such accommodation firmly tethers the State Board's jurisdiction outside the constitutional tent that protects the Association's First Amendment rights.

## IV

■ For basically the same reasons, we reach the same result with respect to the Association's Free Exercise claim. The Association, quoting the Seventh Circuit in *Catholic Bishop,* first argues that "the very threshold act of certification of the union necessarily alters and impinges upon the religious character of all parochial schools." 559 F.2d at 1123. Support for such an absolute view is found neither in case law nor the history of the First Amendment. The First Amendment guarantees that all are free to believe and free to act in the exercise of their religious convictions. Freedom to believe is absolute. Freedom to act is not. *See Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

A determination of whether state regulation of the way the Association acts in its relations with its lay teachers violates free exercise requires a balancing test. The burden the state imposes on the Association's exercise of its religious beliefs must be weighed against the State's interests in enforcing the Act. We must consider whether: (1) the claims presented were religious in nature and not secular; (2) the State action burdened the religious exercise; and (3) the State interest was sufficiently compelling to override the constitutional right of free exercise of religion. *See Wisconsin v. Yoder,* 406 U.S. 205, 214–15, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). *See also* Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development, Part I. The Religious Liberty Guarantee,* 80 Harv.L.Rev. 1381, 1390 (1967).

### A

We first turn to whether the claims presented here are religious and not secular. Courts have long upheld regulation that merely causes economic hardship or inconvenience. *See, e.g., Braunfield v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (Pennsylvania's Sunday closing laws did not violate free exercise of Orthodox Jewish merchants). Many matters that pertain to private schools are already subject to governmental regulation. The Association must meet state requirements for fire inspections, building and zoning regulations and compulsory school

attendance laws, all of which regulate the conduct of the Association's schools. *See Lemon v. Kurtzman,* 403 U.S. at 614, 91 S.Ct. at 2112; *see also Wolman v. Walter,* 433 U.S. at 240, 97 S.Ct. at 2601 (state may test teachers to ensure minimum education standards are met); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (state, under its police power, may regulate and license parochial schools).

Nor may the claim that any interference by the state in church affairs violates First Amendment rights be grounded on the history of the Amendment. Rummaging about in the attic of First Amendment history is not always helpful. The religious concerns of the drafters of the Bill of Rights and those faced today are over two-hundred years apart. Nonetheless, a brief look back reveals that the two Founding Fathers most closely identified with the Religion Clauses focused not on regulation of conduct, but on separation of church and state and the unalienable right to freedom of religious belief. Their concern was more to prevent the establishment of an authoritarian state church like, for example, the Church of England, than it was with state regulation. As Thomas Jefferson explained in the letter that contained his oft-cited phrase concerning the "wall of separation," even though the legislative powers of government do not reach opinions, they do reach conduct. Letter from Thomas Jefferson to a Committee of the Danbridge Baptist Association (Jan. 1, 1802), *The Life and Selected Writings of Thomas Jefferson* 332–33 (Modern Library ed. 1944); *see also Memorial and Remonstrance Against Religious Assessments,* 8 *The Papers of James Madison* 298, 299 (1973).

### B

The Association does not contend that collective bargaining is contrary to the beliefs of the Catholic Church. Not only does the Act not compel a belief in the value of collective bargaining, *see Cap Santa Vue, Inc. v. NLRB,* 424 F.2d 883, 886–89 (D.C. Cir.1970), but the Encyclicals and other Papal Messages make clear that the Catholic Church has for nearly a century been among the staunchest supporters of the rights of employees to organize and engage in collective bargaining. Kryvoruka, *The Church, the State and the National Labor Relations Act: Collective Bargaining in the Parochial Schools,* 20 Wm. & Mary L.Rev. 33, 52 n. 74 (1978). That strong commitment to social and economic justice and collective bargaining was recently reaffirmed in the draft of the Catholic Bishops' Pastoral Letter of November 11, 1984. *See* N.Y. Times, Nov. 12, 1984, at B11, cols. 5 & 6.

Thus, the constitutionality of the Board's assertion of jurisdiction must only be considered with respect to its direct effect on religious beliefs. To find that an enactment violates the right to free exercise of religious beliefs, "it is necessary ... for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." *School District v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963). The injury must be "a demonstrable reality," not merely a speculative possibility, *Beck v. Washington,* 369 U.S. 541, 558, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962), and compliance with the regulation must be directly contrary to claimant's religious beliefs. *Wisconsin v. Yoder,* 406 U.S. at 214–15, 92 S.Ct. at 1532–33. We have already addressed both the claim that Board jurisdiction might require reinstatement of an individual who otherwise would have been fired for religious reasons, and the claim that the duty to bargain over the secular terms and conditions of employment imposes a burden on the Church. For the reasons discussed in Part III, and because of the restrictions we have placed on the Board's power, these claims do not burden freedom of religious exercise.

### C

But a lingering question remains as to whether State Board jurisdiction may impermissibly chill free exercise rights;

whether, as the Seventh Circuit found, "[t]o minimize friction between the Church and the Board, prudence will ultimately dictate that the bishop tailor his conduct and decisions to 'steer far wider of the unlawful zone' of impermissible conduct." 559 F.2d at 1124 (quoting *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)).

 It is necessary, then, to decide whether this indirect and incidental burden on religion is justified by a compelling state interest. *See, e.g., Cantwell v. Connecticut*, 310 U.S. at 307–08, 60 S.Ct. at 904–05 (Jehovah's Witness's conviction for soliciting religious contributions was reversed because there existed no compelling state interest); *Sherbert v. Verner*, 374 U.S. 398, 406–09, 83 S.Ct. 1790–1795–96, 10 L.Ed.2d 965 (state law that denied Seventh Day Adventist unemployment compensation violated free exercise clause because state had no compelling interest). Here a compelling state interest exists. State labor laws are essential to the preservation of industrial peace and a sound economic order. Upon approving the 1968 amendment bringing employees of religious associations and others within the coverage of the State Labor Relations Act, Governor Rockefeller characterized it as the most important amendment to the Labor Law in recent years, stating:

> These workers will now enjoy the full protection of the State Labor Relations Act so that they may bargain collectively with their respective employers through representatives of their own choice. These basic rights and privileges have long been enjoyed by nearly all other workers in the State and the bill recognizes that it is no longer appropriate to distinguish between categories of employers with regard to the protection of these essential rights.

1968 N.Y.Sess. Laws (McKinney's), ch. 890 at 2389 (amending N.Y.Labor Law § 715). There is a compelling public interest in finding that all unions and employers have a duty to bargain collectively and in good faith. *Cap Santa Vue*, 424 F.2d at 890. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 42, 57 S.Ct. 615, 626, 81 L.Ed. 893 (1937). Thus, even if the exercise of Board jurisdiction has an indirect and incidental effect on employment decisions in parochial schools involving religious issues, this minimal intrusion is justified by the State's compelling interest in collective bargaining.

V

The judgment appealed from insofar as it held there was no preemption by the National Labor Relations Act is affirmed and the Association's cross-appeal is dismissed. Insofar as the judgment granted summary judgment and injunctive relief in favor of the plaintiff Association upon a finding of a First Amendment violation, it is reversed and the case is remanded with directions to enter summary judgment in favor of the defendant State of New York permitting it to exercise its jurisdiction over the Association in accordance with this opinion.

GEORGE C. PRATT, Circuit Judge, dissenting:

Although I agree with the majority opinion on the preemption issue, I dissent on the constitutional issue for the reasons set forth in Judge Lasker's opinion below, 573 F.Supp. 1550 (S.D.N.Y.1983), and in the seventh circuit's opinion in *Catholic Bishop v. NLRB*, 559 F.2d 1112 (7th Cir.1977) (aff'd. on other grounds, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979)).