**UNIVERSIDAD CENTRAL DE BAYAMON, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Union de Profesores Universitarios, Intervenor.**

No. 85–1074.

United States Court of Appeals, First Circuit.

Heard Sept. 12, 1985.

Decided Dec. 4, 1985.

Opinions En Banc June 13, 1986.

Coffin, Circuit Judge, filed an opinion in which Bownes, Circuit Judge and Bailey Aldrich, Senior Circuit Judge, joined.

En banc opinion of Breyer, Circuit Judge

Carole O'Blenes with whom Saul G. Kramer, Proskauer Rose Goetz & Mendelsohn, New York City, and Dominguez & Totti, Hato Rey, P.R., were on brief, for petitioner.

Barbara A. Atkin with whom Howard E. Perlstein, Washington, D.C., were on brief, for the N.L.R.B.

Before COFFIN, ALDRICH and TORRUELLA, Circuit Judges.

COFFIN, Circuit Judge.

Universidad Central de Bayamon petitions for review of a National Labor Relations Board decision finding violations of the National Labor Relations Act and requiring the University to enter into collective bargaining with the union elected to represent full-time teachers at the University. The University contends that, because it is an institution under the control of a religious order, NLRB jurisdiction would produce excessive entanglement between government and religion in violation of the First Amendment's free exercise and establishment clauses. The Board cross-petitions for enforcement of the order, and

the Union de Profesores Universitarios, charging party before the Board, intervenes. For reasons stated below, we find that the Board properly asserted jurisdiction over the University and that such jurisdiction does not violate the First Amendment.

## I. FACTS

The Universidad Central de Bayamon is a private, nonprofit university governed by a Board of Trustees, the majority of whom must be and are members of the Dominican Order. The University describes itself as a "Catholic-oriented civil institution," which has as its objective "that of providing a humanistic education at an academic level." The University's full-time faculty includes approximately 49 lay teachers and 4 or 5 priests. There is no requirement that the lay faculty be of the Catholic faith, although most are Catholic. The University "welcomes students of all denominations and faiths".

On October 30, 1979, the Union de Profesores Universitarios (the "Union") filed a representation petition with the Board, seeking certification as the bargaining representative of all full-time teaching personnel at the University. The University opposed the petition, in part on the grounds that the Board's assertion of jurisdiction would constitute an impermissible entanglement between government and religion. The Board's Regional Director rejected the University's position, finding that the University's aim of providing a " 'humanistic education at an academic level' " was "entirely secular." The University's request for review of the Regional Director's decision was denied by the Board as raising "no substantial issues warranting review."

In a ballot election, the vote of the faculty was 41 to 9 in favor of representation by the Union and the Union was certified on February 7, 1980. Standing by its belief that the Board had improperly asserted jurisdiction, the University refused to bargain with the Union. In May and July of 1980, the University promulgated new requirements regarding faculty credentials without notifying or bargaining with the Union. Six professors were discharged in May and two professors were discharged in July for failing to meet the new requirements. Because of the University's refusal to bargain, the Union struck the University in September 1980, but returned to work unconditionally in November 1980. Fifteen striking employees were not reinstated by the University.

The Union brought unfair labor practices proceedings in 1980 and 1981, complaining of the University's refusal to bargain, its unilateral changes in employment conditions, and its failure to reinstate the strikers. Hearings were held before an administrative law judge in March 1982 and March 1983. The ALJ found the University had not adduced any new evidence concerning its religious character that would justify overturning the Regional Director's decision regarding the Board's jurisdiction and that no impermissible entanglement between government and religion would occur as the result of such jurisdiction.[1] In December 1984, a three member panel of the NLRB affirmed the ALJ's finding that jurisdiction over the University was proper because its "academic mission is secular".[2] The Board ordered the University to bargain collectively with the Union upon request, to rescind the unilateral changes upon request of the Union, and to offer those employees discharged or denied rein-

---

1. The ALJ did conclude that the University was not required to bargain with the Union concerning any terms and conditions relating to the Center for Dominican Studies in the Carribbean ("CEDOC"). CEDOC is a two-year course of study leading to a Master of Divinity degree in Theology. The primary objective of the program is the formation of candidates for the priesthood. CEDOC has its own board, its own admissions committee and hires and pays for its own professors. The ALJ found that the exercise of NLRB jurisdiction over CEDOC would be improper because of the pervasively religious character of the program.

2. The panel also affirmed that jurisdiction over CEDOC would not be proper.

statement full and immediate reinstatement to their former positions.

## II. FIRST AMENDMENT CLAIM

The University contends that the Supreme Court decision in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), requires us to find that the NLRB has no jurisdiction over a religiously affiliated institution such as the University. In *Catholic Bishop*, the Supreme Court held that the exercise of NLRB jurisdiction over lay teachers in two Roman Catholic parochial schools presented a "significant risk" of infringing the establishment clause of the First Amendment and therefore, absent an affirmative intention of Congress, the Court would not interpret the National Labor Relations Act as conferring such jurisdiction. 440 U.S. at 501–09, 99 S.Ct. at 1319–23. The University argues that allowing NLRB jurisdiction over a religiously affiliated university would create a similar risk of violating both the establishment and free exercise clauses of the First Amendment. Because we find that the religious nature of the University is significantly different from that of the Catholic secondary schools at issue in *Catholic Bishop*, and because we find that NLRB involvement with the University will be circumscribed in important ways, we conclude that NLRB jurisdiction over the University will not create a significant risk of violating either the establishment or free exercise clause. We therefore decline to extend the holding of *Catholic Bishop* to the University in this case, and hold that the jurisdiction assumed on the authority of the National Labor Relations Act is proper.

### A. *Establishment Clause*

To determine whether application of the National Labor Relations Act to the University presents a significant risk of violat-

ing the establishment clause, we apply the three-part test set out by the Supreme Court: (1) the statute must have a secular purpose; (2) the statute's primary effect must neither advance nor inhibit religion; and (3) the statute must not foster excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

There is no doubt in this case that NLRB jurisdiction meets the requirements of having a secular purpose and effect.[3] In determining whether it also meets the standard of not fostering excessive entanglement between government and religion, however, we must look at several related factors: the character and purpose of the institution affected, the nature of the activity engaged in or mandated by the government, and the resulting relationship between government and the religious organization. *Lemon v. Kurtzman*, 403 U.S. at 615, 91 S.Ct. at 2112.

#### 1. *Nature of the Institution*

In *Catholic Bishop*, the Supreme Court found a significant risk of entanglement by focusing primarily on the nature and purpose of the institutions affected. According to the Court, the holding in *Catholic Bishop* was premised on the "critical and unique role of the teacher in fulfilling the mission of a church-operated school". 440 U.S. at 501, 99 S.Ct. at 1319. The Supreme Court noted that the schools in *Catholic Bishop* were similar to those at issue in *Lemon v. Kurtzman;* in both cases, "[r]eligious authority necessarily pervades the school system". 440 U.S. at 501, 99 S.Ct. at 1319 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 617, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971). In *Lemon* and its progeny, the "key role" played by teachers in religious elementary and secondary schools was "the predicate for [the Court's]

---

**3.** As the Ninth Circuit has noted: "The purpose of the National Labor Relations Act is clearly secular—to minimize industrial strife burdening interstate commerce by protecting employees' rights to organize and bargain collectively. *NLRB v. Jones & Laughlin,* 301 U.S. 1, 42–43, 57

S.Ct. 615, 626–27, 81 L.Ed. 893 (1937). And the Act's primary effect is to require collective bargaining and reduce labor disruptions, rather than to promote or deter acceptance of the Catholic faith." *St. Elizabeth Community Hospital v. NLRB,* 708 F.2d 1436, 1441 (9th Cir.1983).

conclusions" that governmental aid to such schools creates an impermissible entanglement between government and religion. *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319. In *Catholic Bishop*, the Court found that Board jurisdiction over faculty-administration relationships in schools permeated with a religious mission would similarly create a significant risk of entanglement. *Catholic Bishop*, 440 U.S. at 502–03, 99 S.Ct. at 1319–20.

The Central Bayamon University differs significantly from the secondary schools at issue in *Catholic Bishop*. There is no doubt that the University is a religiously affiliated school and that religion is a facet of the school's existence. The University was founded by the Dominican Order in 1961 and was incorporated as a non-profit association in 1964 by three Dominican priests. The University is governed by a Board of Trustees, the majority of whom must be and are members of the Dominican Order. The President of the University, who has broad powers and authority, similarly must be a member of the Dominican Order. The University defines itself in its bylaws and school bulletin as a "Catholic-oriented" institution, requires its students to take one course in theology and three in philosophy, and it offers regular masses in a church adjoining the campus.

Despite these religious aspects, however, the University's religious character is significantly less dominant than that of religious elementary and secondary schools. The University defines its objective as the provision of a "humanistic education at an academic level" and has an open admissions policy, recruiting applicants of all creeds. Hiring of faculty personnel is made on the basis of ability and experience; University bylaws require only that applicants "possess the appropriate academic degrees, be of a sound moral character and show traits of pedagogical qualities". The University does not require any religious observance on the part of its lay faculty and guarantees them full academic freedom. Since 1970, apart from receiving government funds, *see* n. 7, *infra*, the University has been financially self sufficient.

Although the University offers masses at a church adjoining the campus, attendance by students is optional. The one required theology course, Analysis of Biblical History and Literature, is taught by both lay and religious faculty and focuses on an historical and literary analysis of Biblical texts. The teachers are not required to follow a specified religious analysis. The three required philosophy courses—ethics, logic, and the philosophy of man—cover a wide variety of thinkers, including religious and atheist writers.

Painting, as we are required to do, a "general picture of the institution, composed of many elements", *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 758, 96 S.Ct. 2337, 2350, 49 L.Ed.2d 179 (1976), we find that the University meets the picture of an "institution with admittedly religious functions but whose predominant higher education mission is to provide their students with a secular education". *Tilton v. Richardson*, 403 U.S. 672, 687, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (1971). The mandatory theology and philosophy courses "only supplement a curriculum covering 'the spectrum of a liberal arts program'" and are taught "in an atmosphere of intellectual freedom". *Roemer*, 426 U.S. at 755–57, 96 S.Ct. at 2349–50. The "central purpose" of the faculty is not "the inculcation of religious values" in the student body, *Cuesnongle v. Ramos*, 713 F.2d 881, 883 (1st Cir.1983) (finding Central University of Bayamon to be less pervasively religious than a parochial school), but is rather to provide a high quality academic education. Thus, as with other religiously affiliated universities analyzed by the Supreme Court, *see Roemer*, 426 U.S. at 755–59, 96 S.Ct. at 2349–51; *Hunt v. McNair*, 413 U.S. 734, 743–44, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973); *Tilton*, 403 U.S. at 685–89, 91 S.Ct. at 2099–2101, we find that "religious indoctrination is not a substantial purpose or activ-

ity" of the University. *Tilton*, 403 U.S. at 687, 91 S.Ct. at 2100.[4]

The fact that the Dominican Order controls a majority of the University's Board of Trustees does not change our analysis. In *Tilton*, 403 U.S. at 686–87, 91 S.Ct. at 2099–2100, the four colleges were admittedly governed by Catholic religious organizations, and in *Hunt*, 413 U.S. at 743–44, 93 S.Ct. at 2874, the college was wholly controlled by the South Carolina Baptist Convention. *See also, Roemer*, 426 U.S. at 758–59, n. 21, 96 S.Ct. at 2350–51, n. 21 (even where religious organization wholly controls a college, the college may still be found not to be "pervasively sectarian"). Thus, although we have little difficulty in accepting that the statement by the Archbishop of San Juan that the University was "not a Catholic university" merely reflected a power struggle between the Dominican Order and the Catholic hierarchy over control of the University, we do not find the issue to be of overwhelming importance. Even accepting that the Dominican Order, a clearly religious organization, controls the University, we find that the "general picture" of the University remains one of a more secular, rather than sectarian, university.[5]

We also note that it is precisely because the University is similar in character to the colleges in *Tilton, Roemer,* and *Hunt* that it is able to receive governmental aid.[6] Although the fact that the University is eligible for federal aid is not dispositive of the *Catholic Bishop* inquiry, *see infra* p. 911, it is relevant to the analysis of the institution's religious nature. Indeed, the Supreme Court in *Catholic Bishop* referred to the aid-to-school cases in its analysis of the risk of entanglement that could ensue between the religious parochial schools and the government. *Catholic Bishop*, 440 U.S. at 501–04, 99 S.Ct. at 1319–20.

Based on our review of the record, we affirm our earlier ruling that the University is distinctly different from a religious elementary or secondary school. *Cuesnongle v. Ramos*, 713 F.2d 881, 883 (1st Cir. 1983). A religious mission does not pervade the entire University system, with teachers playing a key role in the transmission of a particular religious faith to the student body. Thus, the very premise on

---

**4.** The characteristics of religiously affiliated colleges such as the University stand in strong contrast to those of elementary and secondary schools. The Supreme Court has noted that " '[t]he affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age' ". *Tilton*, 403 U.S. at 686–87, 91 S.Ct. at 2099–2100 (quoting *Walz v. Tax Commission*, 397 U.S. 664, 671, 90 S.Ct. 1409, 1412, 25 L.Ed.2d 697 (1970)). These "parochial schools involve substantial religious activity and purpose", *Lemon*, 403 U.S. at 616, 91 S.Ct. at 2113, and indeed their *"raison d'etre ...* is the propagation of a religious faith". *Lemon*, 403 U.S. at 628, 91 S.Ct. at 2118 (Douglas, J., concurring)

**5.** We also find that the ALJ did not commit reversible error when he excluded some evidence regarding the official designation of the University as a "Catholic" institution, subject to the supervision of the Holy See. First, the ALJ did reopen the hearing specifically to hear evidence regarding the relationship between the University and the Catholic hierarchy, and only certain additional documents, offered during the hearing, were excluded. Second, even if all the requested evidence had been admitted, we do not see how it would have changed the ultimate conclusion. The excluded evidence was offered to prove that the University was indeed a "Catholic" institution, subject to the supervision of a religious organization. But the issue of control is simply one factor in the analysis of impermissible entanglement. Indeed, we reach our conclusion on the assumption that some religious organization—be it the Dominican Order or the Catholic Church—does control the University. This case is, therefore, quite different from *Burns Electronic Security Services, Inc. v. NLRB*, 624 F.2d 403 (2d Cir. 1980), relied on by petitioner. In *Burns*, the court found that "unusual circumstances" merited the conclusion that the ALJ should have accepted new evidence at the unfair labor practices proceeding. These circumstances included the fact that the requested evidence was dispositive of a critical issue in the unit certification question and the record compiled at the original representation hearing was clearly deficient. *Burns*, 624 F.2d at 408–10.

**6.** From 1977 to 1978, the University received various federal grants totaling $5,042,298, of which $350,000 was direct aid to the University. From 1980 to 1983, the University received $3,750,000 in federal grants, seventy-five percent of which was student aid and $425,000 of which was direct institutional assistance.

which *Catholic Bishop* was based—that a significant risk of entanglement existed because of the unique role played by teachers in secondary schools—is conspicuously absent here. We therefore decline to extend the holding of *Catholic Bishop* to the University simply on the basis of the University's religious character. Further, we do not find that the jurisdiction subsequently conferred would create an impermissible entanglement between government and religion because of the University's religious nature.

### 2. *Nature of NLRB Activity*

The fact that the University is not identical to a parochial school does not, however, end our inquiry. As we noted above, whether governmental activity engenders excessive entanglement with religion is the result of several related elements; apart from the character and purpose of the institution affected, we also look at the nature of the activity engaged in or mandated by the government, and the resulting relationship between government and the religious organization. *Lemon*, 403 U.S. at 615, 91 S.Ct. at 2112. In *Catholic Bishop*, the nature of the schools was so pervasively religious that the Court easily found a strong likelihood of entanglement. It is possible, however, that even in only partially sectarian institutions, a significant risk of entanglement could exist if the governmental activity involved was such that it directly affected the particular religious facets of the institution. We conclude, however, that NLRB involvement with the University would not be of the kind that would create an impermissible entanglement between government and religion.

First, the Board will become involved with the University only at the point that an unfair labor practice charge is filed. *Radio Officers' Union v. NLRB*, 347 U.S. 17, 53, 74 S.Ct. 323, 342, 98 L.Ed. 455 (1954) (without a charge, the Board has no authority to issue a complaint); *NLRB v. Verni-*

*tron Electrical Components*, 548 F.2d 24, 27 (1st Cir.1977) (Board can only proceed when charge is filed and employer named as respondent). After the filing of a complaint, the Board does have broad authority to make a full and complete investigation. *NLRB v. Fant Milling Co.*, 360 U.S. 301, 308, 79 S.Ct. 1179, 1183, 3 L.Ed.2d 1243 (1959). But the Board does not have *carte blanche* to expand the charge as it wills; it is limited to " 'practices which are related to those alleged in the charge and which grow out of them' ". *Id.*, quoting *National Licorice Co. v. NLRB*, 309 U.S. 350, 369, 60 S.Ct. 569, 579, 84 L.Ed. 799 (1940).

This activity on the part of the Board is quite different from the continuous auditing surveillance feared by the Supreme Court in *Lemon*, 403 U.S. at 619, 91 S.Ct. at 2114. ("A comprehensive, discriminating, and continuing state surveillance will inevitably be required to ensure that these [government] restrictions are obeyed and the First Amendment otherwise respected.") This restricted involvement of a labor board has been recognized by other courts. In *Catholic High School Ass'n v. Culvert*, the Second Circuit held that New York State labor board jurisdiction over Catholic parochial schools would not create excessive entanglement between the religious schools and the government. Among other factors, the court noted that "the State Board's supervision over the collective bargaining process is neither comprehensive nor continuing". 753 F.2d 1161, 1167 (2nd Cir.1985). The Ninth Circuit, in holding that the NLRB had jurisdiction over a religiously affiliated hospital, explained that "Board jurisdiction will produce only incidental intrusion by requiring examination of [the hospital's] actions and conduct only with respect to specific charges which may be filed in the limited area of collective bargaining and labor relations". *St. Elizabeth Community Hospital v. NLRB*, 708 F.2d 1436, 1442 (9th Cir.1983).[7]

---

7. In cases analyzing the application of Title VII to religious institutions, courts have similarly found that the authority of the Equal Employ-

ment Opportunity Commission to engage in a wide-ranging investigation of a college's hiring practice does not result in "on-going interfer-

Second, many of the unfair labor practices that will be presented to the Board will be entirely secular. For example, in the case before us, there is no assertion by the University that the promulgation of new academic requirements or the denial of reinstatement for the strikers was motivated by any religious considerations. Similarly, among the University's list of the various potential union demands that could implicate religious concerns, there are a number that are sufficiently secular to be a legitimate subject of union bargaining, with any relevant religious considerations taken into account when necessary. For example, the union could indeed bargain for contract provisions requiring that layoffs of clerical and lay faculty be implemented in some form of a seniority order or could bargain for contract rules requiring that course assignments be made on the basis of faculty preference, with seniority to govern in the event of competing preferences. The University, on its part, in maintaining its position on mandatory subjects of bargaining, would be free to take into account any religious concerns it may have. *See NLRB v. Salvation Army of Massachusetts Dorchester Day Care Center*, 763 F.2d 1, 8 & n. 9 (1st Cir.1985).[8]

Finally, in a case where a union bargaining demand or a Board order would truly interfere with the University's religious freedom, the University is free to refuse to bargain with the union or to comply with the order, and to test its position before us. The fact that the University's religious character is not sufficient to insulate it from Board jurisdiction does not mean that it has completely lost the shield of the First Amendment. *See Newspaper Guild v. NLRB*, 636 F.2d 550 (D.C.Cir.1980) (although newspaper is not immune from NLRB jurisdiction merely because it is an agency of the press, certain of its activities are legitimately within the zone of First Amendment protection and must be protected in NLRB orders). The University lists a number of union demands that could potentially interfere with the University's admittedly religious facets.[9] We take quite seriously the University's concern that certain union demands could potentially interfere with its religious character. We expect, however, that the NLRB will also consider these claims seriously and will ensure that its orders are shaped so as to pass constitutional muster. For example, one of the University's main concerns appears to revolve around limitations on its freedom to discharge faculty for religious reasons. The law is clear, however, that even a discharge based in part on protected union activity will not be considered an unfair labor practice if the employer can show that the individual would have been discharged in any event for a non-union reason. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). Such a reason could certainly be one based on religious considerations. Thus, the Board may not find that the University has engaged in an unfair labor practice if the University shows it has discharged an employee for religious reasons. *See Catholic High*

ence with the college's religious practices." *EEOC v. Mississippi College*, 626 F.2d 477, 488 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). The Fifth Circuit came to this conclusion regarding a college whose purpose was to "provide a college education in an atmosphere saturated with Christian ideals," and whose character was found by the court to be "pervasively sectarian." *Id.* at 479, 487.

**8.** Although we have discussed the nature of the University's religious character in a separate section, it is useful to note that it is largely due to the fact that the University is not a pervasively sectarian institution that many of the employment issues affecting its faculty will be exclusively or primarily secular.

**9.** Examples of potential union demands include: elimination of the faculty regulation subjecting teachers to dismissal for "personal behavior" inconsistent with University standards, such as the procuring or urging the procurement of an abortion; defining the "offenses to Christian morality" for which tenure may be rescinded; demands that faculty members have the "right" to urge, publish, and disseminate views critical of Catholic doctrine; and demands that biology teachers have the "right" to refuse to teach creation theory.

*School Ass'n v. Culvert,* 753 F.2d at 1168–69.

Both in determining whether the University has engaged in an unfair labor practice, and in fashioning a remedial order, *see Passaic Daily News v. NLRB,* 736 F.2d 1543, 1556–59 (D.C.Cir.1984) (court ordered Board remedy tailored to accommodate newspaper's First Amendment rights), the Board is constitutionally required to consider and accommodate the University's legitimate First Amendment rights. In any instance in which the University feels the Board has failed, and that its First Amendment rights have indeed been violated, we stand ready to hear that claim.

Thus, given the form of NLRB jurisdiction over the University, and the safeguards that accompany that involvement, we do not find that a significant risk of entanglement between government and religion will occur as the result of this type of governmental involvement with a religiously affiliated institution. Jurisdiction may therefore be assumed under the National Labor Relations Act, and such jurisdiction is constitutional.

## B. Free Exercise Claim

The University argues that allowing Board jurisdiction would create a significant risk of violating the free exercise clause of the First Amendment. According to the University, this violation would occur through the immediate, symbolic invasion of church autonomy, through Board decisions that will impede the University's free exercise of religion, and through the "chilling effect" that will result from the University's knowledge that religiously motivated decisions will be subject to review by the Board.

To determine whether a statutory enactment would violate the free exercise clause, the Supreme Court has examined: (1) the extent to which a statute actually burdens the exercise of a religious belief, *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 1963, 85 L.Ed.2d 278 (1985); (2) the existence of a compelling state interest to justify the bur-

den on religious beliefs; and (3) the extent to which an exemption from the statute would impede the objective sought to be advanced by the statute. *U.S. v. Lee,* 455 U.S. 252, 257–59, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982); *Wisconsin v. Yoder,* 406 U.S. 205, 220–21, 92 S.Ct. 1526, 1535–36, 32 L.Ed.2d 15 (1972); *EEOC v. Mississippi College,* 626 F.2d 477, 486 (5th Cir. 1980).

Allowing NLRB jurisdiction over the University would have only a limited effect, if any, on the University's direct exercise of its religious beliefs. The University does not claim that Catholic doctrine forbids collective bargaining or requires it to engage in unfair labor practices. *See St. Elizabeth Community Hospital v. NLRB,* 708 F.2d 1436, 1442–43 (9th Cir.1983). There is no evidence that NLRB jurisdiction meets the required standard of having a "coercive effect" on the practice of religion on the part of any members of the University. *See Abington School District v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963).

The University is concerned, however, that its religious freedom could be "chilled" because of the very existence of Board review. This concern is quite possibly overrated by the University because, as discussed above, the Board is required to be sensitive to and to accommodate the University's religious concerns. However, to the extent that NLRB jurisdiction may create an incidental burden on religion, we find that it is justified by a compelling state interest. There is a compelling government interest in minimizing economic disruptions caused by labor unrest. *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 42, 57 S.Ct. 615, 626, 81 L.Ed. 893 (1937). This interest clearly extends to universities. In affirming Board jurisdiction over private, nonprofit educational institutions, we concurred in the Board's recognition that "universities affect commerce more than they once did, being now more involved in private commercial activity, and receiving extensive federal support". *NLRB v. Wentworth Institute,* 515 F.2d

550, 554 (1st Cir.1975). Thus, even if Board jurisdiction has an incidental effect on the exercise of religion, this minimal intrusion is justified by the state's compelling interest in collective bargaining. *See Catholic High School Ass'n v. Culvert*, 753 F.2d 1161, 1171 (2nd Cir.1985) (minimal intrusion caused by "chilling" effect justified by New York State's interest in collective bargaining).

### III. Inclusion of Dominican Priests in the Bargaining Unit

The University contends that the Board improperly included four or five Dominican priests in the unit of "all full-time faculty members". The University urges that the priests have a "community of interest" with their employer that diverge from those of other employees, and that inclusion of the priests in the bargaining unit would subject them to a "conflict of loyalties". It notes that, in similar cases, the Board has excluded members of a religious order from a bargaining unit. *Carroll Manor Nursing Home*, 202 N.L.R.B. 67, 68 (1973); *Seton Hill College*, 201 N.L.R.B. 1026, 1027 (1973).

We need not decide whether, not having raised this objection in the representation proceeding, the University may raise it now, or whether the priests actually have a community of interest with the University that is distinct from that of the other employees. An employer cannot avoid an obligation to bargain with respect to an entire unit of employees by arguing that some employees were improperly included, unless the inclusion of the contested employees would affect the unit's majority status. *See Walla Walla Union-Bulletin v. NLRB*, 631 F.2d 609, 614–15 (9th Cir.1980); *Glen Manor Home for Jewish Aged v. NLRB*, 474 F.2d 1145, 1150 (6th Cir.), *cert. denied*, 414 U.S. 826, 94 S.Ct. 130, 38 L.Ed.2d 59 (1973). Here, it appears that, at most, five priests were included in the unit. Because the union won by a vote of 41–9,

we cannot find that the inclusion of those priests had an effect on the election outcome. The University is free to seek a unit clarification, pursuant to 29 C.F.R. § 102.- 60 (b), or may refuse to bargain over the rights of the contested employees so as to bring that particular question before the court. *See Walla-Walla Union Bulletin*, 631 F.2d at 615.

### IV. Conclusion

The Board's jurisdiction over the religiously affiliated Central Bayamon University does not create a significant risk of violating the establishment or the free exercise clauses of the First Amendment. Jurisdiction over the University is therefore properly assumed under the National Labor Relations Act.

*The University's petition for review is denied and the Board's order is enforced.*

TORRUELLA, *Circuit Judge* (dissenting).

Although the majority's well-reasoned opinion commands my highest respect, I am compelled to dissent because, to my view, it is contrary to the strict mandates of the First Amendment [1] and the explicit and implicit holdings of *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

### I. *N.L.R.B. v. Catholic Bishop of Chicago*

In *Catholic Bishop* the Court was faced with the exercise of jurisdiction by the Board over lay teachers in certain high schools operated by the Catholic Church. Up to that time the Board standards permitted the assumption of jurisdiction over religiously sponsored organizations if they were merely religiously associated, as compared to where they were completely religious in nature, in which case the Board declined jurisdiction. In *Catholic Bishop* the Board assumed jurisdiction principally on the ground that the high schools in

---

1. U.S.Const., Amend. 1: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."

question, in addition to providing a Roman Catholic oriented education, also provided a traditional secular education and thus were not "completely religious" schools. *Catholic Bishop*, 440 U.S. at 494 n. 7, 99 S.Ct. at 1316 n. 7. The Court rejected the Board's exercise of jurisdiction over the high schools, basing its decision on statutory grounds but giving clear indication of the serious constitutional questions at issue. *Catholic Bishop, supra,* at 504, 99 S.Ct. at 1320.

Initially, in the context of what I am about to discuss, I believe that the key phrase used by the Court in *Catholic Bishop* is "church-operated school." *See* 440 U.S. at 501–504, 99 S.Ct. at 1319–20. *See also N.L.R.B. v. Bishop Ford Central Catholic High School,* 623 F.2d 818, 823 (2d Cir.1980) ("[t]he *Catholic Bishop* Court employed the term 'church operated' not in the restricted sense now seized upon by the Board, but rather as a convenient method of characterizing schools with a religious mission."). It is the existence of such an institution that brings into play the potential for conflict prohibited by the Religion Clauses. There should be no question but that Universidad Central de Bayamón (University) *is* a "church-operated school." To quote from the majority opinion:

> ... There is no doubt that the University is a religiously affiliated school and that religion is a facet of the school's existence.

Op. at 909. The record shows a lot more, however.

The University is the creation of the Dominican Order, and is recognized by the Sacred Congregation for Catholic Education as a Dominican institution, affiliated with the Catholic Church. When founded in 1961 by the Order, it was in fact the Metropolitan San Juan Campus of Catholic

University of Puerto Rico, which has its main campus in Ponce. One of its main objectives was, and is, the philosophical preparation of students.

In 1964, the Regional Vicar of the Dominican Order and two other Dominican priests incorporated Universidad Central de Bayamón as a non-profit association and transferred the campus to the Dominican Convent in Bayamón. Thereafter through 1970, several buildings were constructed by the Order on the Convent's grounds, for use by the University.

In 1970, by reason of an internal dispute between the Order and the Church's local hierarchy as to who would control the University, the University separated from Catholic University of Puerto Rico. In 1980 an agreement was reached between the Master General of the Order and the Archbishop of San Juan,[2] which acknowledged a pastoral connection between the University and the Archdiocese of San Juan, but reserved to the Dominican Order all matters relating to the religious orientation, educational philosophy, and internal discipline of the University.

The University is at the top of an integrated Catholic school system, owned and operated by the Dominican Order. As such, the University owns and operates two elementary and secondary schools. Those schools are governed by the Board of Trustees of the University. The President of the University, who is also the Regional Vicar of the Dominican Order, is their Chief Executive Officer. The principals of the schools report directly to the Vice President of the University.

In 1980, the University began operating a seminary called the Center for Dominican Studies in the Caribbean (CEDOC). In 1982 the University restructured CEDOC's program to provide for two years of study

---

**2.** "Agreement in Relation to the Catholicity of the Universidad Central de Bayamón." Among other things, the agreement provides:

> ARTICLE 5: THE UNIVERSIDAD CENTRAL DE BAYAMON hereby agrees, under the responsibility of the General Master of the Dominican Order, to create and maintain within its internal structure, some effective and ap-

propriate organism that could exercise a self-reglamentation in the areas of FAITH, MORAL and DISCIPLINE.

In the exercise of his right to oversee, the Bishop will call upon the right authorities of the Universidad Central de Bayamón. Should he be dissatisfied, he will then call upon the General Master of the Dominican Order.

leading to a master's degree in theology. The program is open to any qualified student, lay or religious, but its primary objective is the preparation of candidates for priesthood. The CEDOC is both physically and academically a part of the University. Yet, the Board declined to exercise jurisdiction over CEDOC "because of the pervasively religious character of the program." At 908 n. 1.[3]

The University is governed by a self-perpetuating Board of Trustees, a majority of whom must be and are members of the Dominican Order. These include the Regional Vicar of the Order, the Prior of the Dominican Convent of Our Lady of the Rosary, and the President of the University. The executive committee of the University, which runs the University between meetings of the Board, is composed of five members, a majority of which must be members of the Dominican Order.

The board of trustees is composed of ten members, six of whom are members of the Dominican Order and all of whom are Roman Catholics. The Regional Vicar, Father Van Rooij, has been President of the University and Secretary of its board of trustees since 1970.

The president of the University must be a member of the Dominican Order. He appoints all University officials and employees, including deans, department heads and members of the faculty. He also grants tenure. He has the power to adopt the curricula and standards, policies and procedures of the University. He interprets the by-laws and all regulations, and his decisions in this regard are final.

The religious mission of the University as a "church operated school" is further accentuated by various of its constituting documents. The agreement with the Archbishop (see footnote 1) binds the University "to keep the faith of the Roman, [Apostolic] and Catholic Church, and a catholic education[al] philosophy." The by-laws of the University state that it is a "Catholic-ori-ented civil institution." The bulletin distributed to students indicates that the University is a "liberal arts institution denominationally affiliated with the Roman Catholic Church, and the Dominican Order," and that "B.C.U. is preeminently a Catholic oriented university." It also advises students that "[r]egular masses are held daily in the Catholic Church of the Dominican Order adjoining the campus."

All students, regardless of their course of study, are required to take at least three credits of theology and nine credits of philosophy in order to receive a degree. The required theology courses are normally taught by priests and the suggested text was prepared by a Dominican priest. The theology and philosophy courses are taught from a Catholic point of view, and their purpose is formative, rather than simply informative.

Most of the faculty members are Roman Catholics. All are apprised of their responsibility to adhere to the Catholic philosophy of the institution. That philosophy is applied in the selection and hiring of faculty members. In fact the hiring contract requires faculty members "[t]o know, respect and uphold the University's philosophy." The Faculty Regulations state that it "shall at all times put into practice [the University's] philosophy of being a Catholic-oriented institution." Among the causes for rescission of a faculty contract, or of tenure, are violations of the standards established by the University, "especially those pertaining to personal behavior" and "offenses to the Christian morality." Approximately 10% of the University's faculty are priests, who are included in the representation unit certified by the Board. This is significantly different from the situation in *Catholic Bishop*, where only lay teachers sought representation.

In my opinion, it is difficult to understand how the University's integrated educational system, which commences at the parochial school level, continues through

---

3. This last statement accentuates precisely one of the analytical flaws prevalent in the Board's reasoning, which error is adopted by the majority and which we shall discuss presently. *See infra,* page 909.

high school into college, and ends with a religious graduate school, can be perceived as anything but a *church-operated school with a religious mission.* It would appear senseless to me for the University to have imposed all its religious requirements regarding, for example, the composition of its management, if promotion of the Catholic religion were not its objective. Granted that, perhaps when dealing with university-level students, a "softer sell" is possibly more effective than other approaches appropriate at the parochial school level, but that merely is a reflection of the University's proselytizing tactics, not a negation of its religious mission. To my view the evidence in this case is overwhelming that the University is "church operated" within the meaning of *Catholic Bishop.*

The Board and the majority [4] are still relying *sub silencio* on the "completely religious" versus "religiously associated" test rejected by the Court in *Catholic Bishop, supra,* 440 U.S. at 494 n. 7, 99 S.Ct. at 1316 n. 7. The *Catholic Bishop* standard is whether the school is a *church-operated school.* Once this threshold issue is passed, the reviewing court is then required to determine, again under *Catholic Bishop,* whether the Board's assumption of jurisdiction over the church-operated school presents a *significant risk* of infringing on Religion Clauses rights. *Id.* at 502, 99 S.Ct. at 1319.

II. *The First Amendment and the Standard of Review*

It may not be coincidental that the concepts embodied in the Religion Clauses are contained in the *first* clauses of the *First* Amendment. I make this asseveration conscious of the fact that state-church entanglement and freedom from religious persecution, the principal subject-matters of

those clauses, were among the most important concerns in the list of evils sought to be guarded against by the Founding Fathers.[5] Indeed, the Supreme Court has indicated that these interests "plainly rank high in the scale of our national values." *Catholic Bishop,* 440 U.S. at 501, 99 S.Ct. at 1319.

The Religion Clauses forbid two quite different kinds of government encroachment upon religious freedom. The establishment clause bars a state from promoting religion or adopting a hostile attitude towards religion, *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The free exercise clause recognizes the right of every person to choose his own course in the pursuit of his religious beliefs, free from compulsion by governmental authority, which includes the right of nonbelief. *Johnson v. Board of County Commissioners,* 528 F.Supp. 919 (D.N.M. 1981). Notwithstanding this dichotomy, the Framers understood these two components to be compatible and mutually supportive. Thus, to the extent that these clauses reinforce one another, doctrines developed under one clause may also be relevant to the other. *See Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Surinach v. Pesquera de Busquets,* 604 F.2d 73, 79 (1st Cir.1979). *See also* Tribe, *supra* note 5, at 814–15, 834. There is sufficient overlapping of issues in the present case to allow for the joint discussion of the questions raised respecting both components of the Religion Clauses. *See Abington School District v. Schempp,* 374 U.S. 203, 222, 83 S.Ct. 1560, 1571, 10 L.Ed.2d 844 (1963); *Catholic Bishop of Chicago v. N.L.R.B.,* 559 F.2d 1112,

---

**4.** The approach is reflected in the statement found at page 910 of the opinion:

> Even accepting that the Dominican Order, a clearly religious organization, controls the University, we find that the "general picture" of the University remains one of a more secular, rather than sectarian, university.

The majority's footnote 5 is omitted, but should be read. *See also Cuesnongle v. Ramos,*

713 F.2d 883 (1st Cir.1983). (Central University of Bayamon less pervasively religous than a parochial school).

**5.** *See generally* L. Tribe, *American Constitutional Law,* (1978); Novack, Rotunda & Young, *Constitutional Law* (2d ed.1983).

1131 (7th Cir.1977), *aff'd,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).

Two concepts are important in providing a framework for analysis of the rights established by the Religion Clauses. The first concept is the core ideal of religious autonomy. Tribe, *supra,* at 812. Clearly, without the right to conduct one's own affairs free from governmental influence, religious freedom and the concomitant rights guaranteed by the First Amendment would be meaningless. *See* Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right of Church Autonomy,* 81 Colum.L.Rev. 1373 (1981). The second concept concerns the fact that, almost inevitably, religious activity "is inherently associational, interposing the religious community or organization between the state and the individual believer." Tribe, *supra,* at 812.[6]

These two concepts interplay. In many situations individual religious rights are ultimately the ones affected notwithstanding that the questioned governmental action initially, or on its face, is directed at an organization, and even though its collective rights may also be in jeopardy. Laycock, *supra.* The net result of this interplay of rights is that, in many cases, although the issue is framed in terms of determining whether the autonomy of a religious organization has been breached by the governmental action, individual religious rights are also at issue. I believe that such is the present case. Although the questions before us primarily affect appellant as an organization, individual religious rights are also ultimately affected: those of the teachers, those of the students, those of the parents of the students, those of the religious members of the university community. The governmental action here

challenged has a chilling effect on the exercise of individual religious rights also.

Underlying any analysis of whether challenged governmental conduct is violative of the Religion Clauses, whether involving individual or organizational rights or a combination of both, there are two fundamental principles: voluntarism, standing for the proposition "that Religion or this duty which we owe our Creator and the Manner of discharging it, can be directed only by reason and conviction, not by force or violence,"[7] and separatism, sometimes called the "nonentanglement" principle, which reflects James Madison's position that both religion and government can best achieve their high purposes if each is free from the other's influence.[8]

In testing for compliance with these principles, which ensure the autonomy of religious organizations (and ultimately of individuals as well), it is required that the challenged governmental action be at least justifiable in secular terms. Tribe, *supra,* at 835. Thus has evolved the three-pronged test proclaimed in *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), requiring that the questioned governmental action have a secular purpose, a primarily secular effect, and an absence of excessive religious entanglement. Even if it can be shown that governmental action is not directed at a religious aspect of the organization's life, if the *essential effect* of this action is to influence the pursuit of a religious tradition, the action must be struck down.[9] Tribe, *supra,* at 839. The Supreme Court has expanded this requirement to demand that any non-secular effect be *remote, indirect and incidental,* thus compelling a high standard of review from the judiciary to determine whether this

---

6. I say "almost inevitably" because the "right to non-belief" also protected by the Religion Clauses, would less frequently involve formal association or organizations.

7. J. Madison, *Memorial and Remonstrance Against Religious Assessments,* quoted in *Walz v. Tax Commission, supra,* 397 U.S. at 719, 90 S.Ct. at 1437 (Douglas, J., dissenting).

8. *See Walz v. Tax Commission, supra,* 397 U.S. at 668, 90 S.Ct. at 1411.

9. It will be struck down under the free exercise clause if the effect is negative (*e.g.,* inhibiting), and under the establishment clause if the effect is positive (*e.g.,* promotional).

stringent rule has been met. *See Committee for Public Education v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Surinach, supra,* 604 F.2d at 79; Tribe, *supra,* at 840. *See also Buckley v. Valeo,* 424 U.S. 1, 64–65, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1974). This precept of stricter judicial review is also triggered by the presence of *administrative entanglement,* a notion that focuses on institutional interference with religion by the state and which comes into conflict with the core ideal of religious autonomy. Tribe, *supra,* at 866. *See also Committee for Public Education v. Nyquist, supra.*

In my opinion the Board's assumption of jurisdiction over appellant, as well as its subsequent actions, has a non-secular effect upon appellant that is *not* remote, indirect and incidental, and creates a significant risk of administrative entanglement between the state and the religious organizations.

### III. *The Entanglement and Non-Secular Effects*

In determining whether a significant risk of entanglement exists, again we need not go much further than *Catholic Bishop.* There the Court said:

> Good intentions by government—or third parties—can surely no more avoid entanglement with the religious mission of the school in the setting of mandatory collective bargaining than in the well-motivated legislative efforts consented to by *the church operated schools* which we found unacceptable in *Lemon, Meek [v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217], and *Wolman [v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714].

The Board argues that it can avoid excessive entanglement since it will resolve only factual issues such as whether an anti-union animus motivated an employer's action. But at this stage of our consideration we are not compelled to determine whether the entanglement is excessive as we would were we considering the constitutional issue. Rather, we make a narrow inquiry whether the exercise of the Board's jurisdiction presents a significant risk that the First Amendment will be infringed.

Moreover, it is already clear that the Board's action will go beyond resolving factual issues. The Court of Appeals' opinion refers to charges of unfair labor practices filed against religious schools. The court observed that in those cases the schools had responded that their challenged actions were mandated by their religious creeds. The resolution of such charges by the Board, in many instances, will necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious missions. *It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.*

The Board's exercise of jurisdiction will have at least one other impact on *church-operated schools.* The Board will be called upon to decide what are "terms and conditions of employment" and therefore mandatory subjects of bargaining. *See* 29 U.S.C. § 158(d). Although the Board has not interpreted that phrase as it relates to educational institutions, similar state provisions provide insight into the effect of mandatory bargaining. The Oregon Court of Appeals noted that "nearly everything that goes on in the schools affects teachers and is therefore arguably a 'condition of employment'."

The Pennsylvania Supreme Court aptly summarized the effect of mandatory bargaining when it observed that the "introduction of how narrowly the scope of negotiation is defined, necessarily represents an encroachment upon the former autonomous position of management." Inevitably the Board's inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the board, or conflicts with negotiators of unions....

*The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school. We see no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow....*

440 U.S. at 501–04, 99 S.Ct. at 1319–20 (emphasis supplied, citations omitted).

The present case arises precisely "in the setting of mandatory collective bargaining," predicted by the Court in *Catholic Bishop* to bring about the prohibited entanglement. *Id.* In the present case the University unilaterally promulgated new requirements regarding faculty credentials without first notifying or bargaining with the Union, an action found by the Board to be contrary to Section 8(a)(5) of the Act (29 U.S.C. § 158(a)(5)) because it constitutes violation of the duty to bargain concerning a mandatory subject of bargaining. 29 U.S.C. § 158(d) ("terms and conditions of employment"). *See, e.g., N.L.R.B. v. Burnup & Sims, Inc.,* 379 U.S. 21, 85 S.Ct. 171, 13 L.Ed.2d 1 (1964). The Court in *Catholic Bishop* unambiguously found such action by the Board to constitute infringement of the First Amendment rights of the church-operated schools in question. Yet unexplainedly the majority goes on to rationalize the appropriateness of Board action, right out from under the protection afforded by the *Catholic Bishop* umbrella. According to the majority, *Catholic Bishop* is not implicated. First it states that the Board will only become involved after an unfair labor practice charge is filed, thus making unnecessary "continuous auditing surveillance" (Op. at 911). Next it claims that many of the charges will be entirely secular (slip op. at 14) and that where the University's religious freedom is truly involved it can refuse to bargain and test its position in court (*id.* at 912). Finally, the majority indicates that it "takes quite seriously the University's concern that certain union demands could potentially interfere with its religious character," but voices the

unrealistic hope "that the N.L.R.B. will also consider these claims seriously and will ensure that its orders are shaped so as to pass constitutional muster" (*id.* at 913). I must confess to having some difficulty with the proposition that condemning the University to interminable *ad hoc* litigation, for the purpose of allowing it to conclude what are the boundaries of its religious freedom, is not "continuous auditing surveillance" or does not have a substantial chilling effect on the exercise of those freedoms by the University. This religious organization is constitutionally entitled to an autonomy that is inhibited by the Board's actions in this case. *See* Laycock, *Towards a General Theory of the Religion Clauses: The Cases of Church Labor Relations and the Right to Church Autonomy, supra.*

This situation is particularly disconcerting in the light of the pronouncements of this court in *Surinach v. Pesquera de Busquets,* 604 F.2d 73, 75–76 (1st Cir.1979) (Coffin, C.J.), in striking down a mere questionnaire sent to all schools, including parochial schools, inquiring into tuition costs:

It is not the obligation of the schools to prove as a precondition for relief at this time that this precise scenario [the possibility that a questionnaire might lead to an economic regulatory scheme], which hardly can be called speculative, in fact will unfold. To the contrary, in the sensitive area of First Amendment religious freedoms, the burden is upon the state to show that the implementation of a regulation scheme will *not* ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance. In cases of this nature, a court will often be called upon to act in a predictive posture; it may not step aside and await a course of events which promises to raise serious constitutional problems.

(emphasis in original, footnotes omitted). The majority is now adopting the "trial run" posture rejected by this court in *Surinach* and by the Seventh Circuit in *Catholic Bishop. See Catholic Bishop of Chicago v. N.L.R.B.,* 559 F.2d 1112, 1126 (7th

Cir.1977), *aff'd*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). It is in fact allowing "the very process of inquiry leading to findings and conclusions," condemned by the court in *Catholic Bishop*, as an "impinge[ment] on rights guaranteed by the Religion Clauses." *Catholic Bishop, supra,* 440 U.S. at 502, 99 S.Ct. at 1319.

In my opinion the Seventh Circuit best stated the case in *Catholic Bishop:*

> If a bishop, for example, should refuse to renew all lay faculty teacher contracts because he believed that the union had adopted policies and practices at odds with the religious character of the institutions, or because he wanted to replace lay teachers with religious-order teachers who had become available, under ecclesiastical law he would have the right if not the duty to take that action. Yet, under the National Labor Relations Act, he might well be found guilty of an unfair labor practice. The real difficulty is found in the chilling aspect that the requirement of bargaining will impose on the exercise of the bishops' control of the religious mission of the schools. To minimize friction between the Church and the Board, prudence will ultimately dictate that the bishop tailor his conduct and decisions to "steer far wider of the unlawful zone" of impermissible conduct. If, for example, a teacher should give a strong pro-union speech at a meeting one week and the next week would advocate the cause of birth control to his or her students or favor the availability to poor people of abortion, the bishop would be confronted with a choice of foregoing his right to discharge the heretical employee or do so at the risk of a protracted and expensive unfair labor practice proceeding before the Board which would certainly in part involve the Church's religious policies and beliefs.

> In sum, it is unrealistic to say that an employer which has to honor a bargaining order is not substantially inhibited in the manner in which it conducts its operations. This is true of all bargaining orders but on the general industrial and commercial scene sound policy considera-

tions have upheld this imposition, inhibiting though it may be, which policy declarations are found at 29 U.S.C. §§ 141 and 151. We do not disagree with the soundness of the legislative policy determinations which have been consistently upheld by the courts. We only say that when that imposition conflicts with the Religion Clauses that the First Amendment protective wall should prevail.

559 F.2d at 1123–1124 (citations omitted). As that court went on to say, "these paradigmatic situations ... are not merely fanciful horror tales devised by an employer who seeks to avoid labor board jurisdiction." *Id.* at 1125. Rather they are situations readily foreseeable in the practical world of labor relations.

Because the Board's assertion of jurisdiction over the appellant violates the First Amendment, I dissent. *See also Catholic High School Ass'n of Archdiocese v. Culvert,* 573 F.Supp. 1550 (S.D.N.Y.1983), *rev'd in part,* 753 F.2d 1161 (2d Cir.1985).

BREYER, Circuit Judge, with whom LEVIN H. CAMPBELL, Chief Judge and TORRUELLA, Circuit Judge, join.

In *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), the Supreme Court, reading the National Labor Relations Act in light of the First Amendment's Establishment Clause, held that the Labor Board lacked jurisdiction over "teachers in church-operated schools." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 507, 99 S.Ct. at 1322. The case before us involves, not secondary schools as in *Catholic Bishop,* but a college or university, called Universidad Central de Bayamon. The legal issue presented is whether *Catholic Bishop* applies to a church-operated college—a college that seeks primarily to provide its students with a secular education, but which also maintains a subsidiary religious mission. Given *Catholic Bishop* 's language and purposes, the risks of forbidden church/state entanglement, and the existence of other, related limitations upon the Labor Board's jurisdiction over university teachers, three of us

conclude that, as in *Catholic Bishop,* the Board lacks jurisdiction in the case before us. Three of us conclude the contrary. Since this court is equally divided, it cannot grant the Labor Board's request to enforce its order requiring the University to bargain with its faculty union.

## I

### *Background*

We can set forth the necessary procedural and factual background briefly. The University is located in Bayamon, Puerto Rico. Its full-time faculty formed a union, which sought certification as bargaining agent; the Board, after a hearing, called for a representation election; the union won the election; it was certified; and the University refused to bargain. At the resulting "unfair labor practice" proceeding, the University renewed its claims, *see* 29 U.S.C. §§ 159(d), 160(e)–(f), that its faculty fell outside the Board's statutory authority, *either* because the university was "church-controlled" (unregulated under *Catholic Bishop* ) *or* because its faculty members, like those of most major university faculties, held various "management" prerogatives over appointments, schedules, and curriculum, thereby depriving them of Labor Act protection, *NLRB v. Yeshiva University,* 444 U.S. 672, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980). The Board's Administrative Law Judge rejected the latter claim on the ground that the faculty had virtually no administrative powers; it rejected the former claim on the basis of Board precedent that refused to apply *Catholic Bishop* to colleges that were neither church-controlled nor "pervasively sectarian." *College of Notre Dame,* 245 N.L.R.B. 386 (1979); *Barber-Scotia College,* 245 N.L.R.B. 406 (1979) (both citing *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), which distinguished colleges from secondary schools in the context of federal aid to education). On review, the Labor Board exempted the University's Catholic seminary from the ALJ's bargaining order; but, it affirmed the order in all

other respects. It wrote in response to the University's *Catholic Bishop* claim:

[T]he University is not owned, financed or controlled by the Dominican Order or by the Roman Catholic Church, and ... the University's academic mission is secular.

A panel of this court, by a vote of 2–1, granted enforcement of the Board's order. The full court, however, vacated the panel's decision and reheard the case en banc, 28 U.S.C. § 46(c); Fed.R.App.P. 35(a), six members of the court sitting in light of the fact that a senior circuit judge was a member of the panel. 28 U.S.C. § 46(c). We are now evenly divided as to the proper outcome.

## II

### *The Nature of the University*

The Board's finding that the Catholic Church does not "control" the University is legally unsupportable; it lacks "substantial evidence" in the record. 5 U.S.C. § 706(2)(E). Rather, the record, as we read it, shows the following:

The University is a "Catholic-oriented" institution of higher learning founded by the Dominican Order of the Roman Catholic Church. The Dominicans provided substantial support, including gifts of land, buildings, scholarships and (perhaps) administrative salaries. Initially, the University was a branch of the Catholic University of Ponce; it awarded only two-year "associate's" degrees. Today, the University is independent of Catholic University and offers a four-year program. It is located on the grounds of the Dominican seminary in Bayamon, Puerto Rico. And, it is part of an integrated educational system that the Dominican Fathers maintain—a system that includes Catholic elementary and secondary schools, the University, and a seminary for priesthood candidates. The University itself consists of four undergraduate divisions—Humanities, Education, Business Administration, and Natural Sciences.

Administrative control of the University lies in the hands of members of the Domini-

can Order. Under the University by-laws, the President of the University must be a Dominican priest. (Its current President is the Order's Regional Vicar, the highest official of the Order in Puerto Rico.) A majority of the Board of Trustees must be Dominican priests. A majority of the five-member executive committee (which acts for the Board between meetings) must be Dominican priests. The Board of Trustees must include the Regional Vicar of the Dominican Order, the Prior of the Convent of Our Lady of the Rosary, and the University President—all Dominican priests. The Dominican Order in Puerto Rico is controlled by a seven-member body called the Council of the Regional Vicarate; five of its seven members are currently members of the University's Board of Trustees.

Moreover, the Administration, responsible to the Board and controlled by the President, exercises far greater authority than in most major universities over the specific detailed decisions that constitute university life. The Administrative Law Judge, in the section of his opinion explaining why the University's teachers do *not* exercise "managerial" authority, *see NLRB v. Yeshiva University, supra,* found that the President (i.e., the Regional Vicar of the Dominican Order) actively controls hiring, firing, promotion and tenure decisions. The Board and the President themselves decide all significant financial issues. The Administration, not the faculty, ultimately determines curriculum, class assignments, class size and workload. The Administrative Law Judge concluded:

> in weighing the totality of what the Respondent's professors do, it is certainly telling that most of their major contribution derives from the implementation of policy set by the president and board of trustees and from merely following orders.... [P]rofessors do not decide when courses will be scheduled.... [I]t was the administration which decided who shall be taught and not the faculty.... The faculty's views have not determined the size of the student body, the tuition to be charged, the location of a school, or anything related to the finan-

cial affairs of the University.... [T]he faculty plays no role in hiring, tenure, sabbaticals, termination, and promotion.... [E]ven in those areas where the faculty has contributed, recommendations have frequently been disregarded.

Although the University's primary mission is the provision of a "basically" secular education, the University also maintains a subsidiary religious mission—a mission described in an agreement between the Dominican Order, the Archbishop of San Juan and the Sacred Congregation of Catholic Education in Rome as follows:

> to keep the faith of the Roman, Apostolic and Catholic Church, and [keep] a catholic education philosophy, in light of the Christian Revelation and guided by the teachings of the Doctors of the Church, foremostly, Saint Thomas Aquinas, and with the impulse of the theological and spiritual patrimony of the Order of Saint Domingo of Guzman, which has originated the University.

The religious and secular missions of the University are not kept totally separate. The University holds itself out to students, faculty and community as a Catholic school. Its "University Bulletin" refers to its religious mission at least thirteen times in its thirty-four pages of text. Its faculty regulations allow discipline for "offenses to the Christian morality." It encourages attendance at Mass. It uses the parochial schools it operates on campus as "teaching laboratories" for education students. It requires all students to take four courses in theology and philosophy, the theology usually being taught by Dominican priests from a Dominican text, and the philosophy having a Catholic orientation. Dominican priests constitute about 10 percent of the faculty. And, the University operates a Catholic seminary on the campus.

Given this record, we conclude that the Dominican Order controls this University. We agree that the record adequately supports the Board's finding that the University's faculty does not play a managerial role in University affairs. We also are willing

to describe the University, *in respect to its mission,* in the language of *Tilton v. Richardson,* 403 U.S. at 687, 91 S.Ct. at 2100, namely, as an:

> [institution] with admittedly religious functions but whose predominant higher education mission is to provide ... students with a secular education.

And, in light of the Board's previous opinions, *see* p. 399, *supra,* we believe it is conscious Board policy not to apply *Catholic Bishop* to an educational institution so described. *See* Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke Law J. 199; *cf. SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Whether this kind of institution of higher education falls within the strictures of *Catholic Bishop* is, in our view, an important, likely recurring, question that calls for Supreme Court guidance.

### III

### *Catholic Bishop*

■ Those of us who conclude that a church-controlled college, such as Universidad Central de Bayamon, falls within the scope of *Catholic Bishop* rest our conclusion on four reasons. First, the language of *Catholic Bishop* itself does not distinguish colleges from primary and secondary schools. Rather, the Court there held:

> Congress did not contemplate that the Board would require church-operated schools to grant recognition to unions as bargaining agents for their teachers.... Accordingly, in the absence of a clear expression of Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses.

*NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 506–07, 99 S.Ct. at 1322.

Second, the "state/religion entanglement" problems that underlay the Court's *Catholic Bishop* holding are present here in full force. For one thing, the *Catholic Bishop* Court feared that a teacher's filing of an unfair labor practice charge might well force the Board to decide the "good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 502, 99 S.Ct. at 1320. The teacher, for example, might claim that rules, regulations, promotions, hirings, and firings reflected an "anti-union animus," while the administrators might claim their actions were based upon religious reasons. *Id.; see* 29 U.S.C. § 158(a)(3); *Radio Officers' Union v. NLRB,* 347 U.S. 17, 45, 74 S.Ct. 323, 338, 98 L.Ed. 455 (1954).

This risk would seem as great in colleges as in secondary schools (particularly secondary schools that the Board, prior to *Catholic Bishop,* classified as "merely religiously associated," *see* p. 402, *infra*). The Dominicans, for example, not only teach Christian ethics at the University, but also claim the right to dismiss teachers for "offenses to the Christian morality." One can imagine the University imposing sanctions upon faculty that relate, let us say, to counseling in the sensitive area of abortion; reviewing such sanctions would place the Board squarely in the position of determining what is "good faith" Dominican practice in respect to such counseling. Indeed, it is difficult to imagine secondary school examples that could not arise with equal ease in the college context.

Further, the Supreme Court in *Catholic Bishop* stated that it

> is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.

*NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 502, 99 S.Ct. at 1320. This kind of "entanglement"—arising out of the inquiry process itself—is well illustrated by an excerpt from the record in this case, an ex-

cerpt in which counsel questioned church officials about liturgies and about confidential communications among church officials. We have placed the excerpt in an appendix, where the reader can compare the excerpt with record excerpts that the Supreme Court quoted in *Catholic Bishop.* We find the two sets of excerpts strikingly similar. In any event, we can see no lesser risk in respect to "intrusive process" at the college, than at the primary or secondary levels of education. In fact, a university's secular mission may lead to more frequent, or more complex "unfair labor charges," requiring the Board to evaluate an allegedly religious motive.

Finally, the *Catholic Bishop* Court expressed concern about the scope of potentially entangling Board inquiry, given the fact that the "terms and conditions of employment" of teachers—"mandatory subjects of bargaining"—in the context of "educational institutions" may concern the whole of school life, for "nearly everything that goes on in the school affects teachers and is therefore arguably a 'condition of employment.'" *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 502–03, 99 S.Ct. at 1320; *Springfield Education Association v. Springfield School District No. 19,* 24 Or.App. 751, 759, 547 P.2d 647, 650 (1976). *See also Pennsylvania Labor Relations Board v. State College Area School District,* 461 Pa. 494, 504, 337 A.2d 262, 267 (1975). It is difficult to see how this problem is any less serious at the college level. (Indeed, the need for "academic freedom" from certain teaching "burdens" might be asserted more strongly at the college level.) The college curriculum (including religious requirements), the manner of teaching (according to Christian principles), the teachers' obligations to counsel the students (and the moral or religious principles that underlie the counseling) would seem, as much as in the case of secondary schools, to be 'conditions of employment' that are 'mandatory subjects of bargaining.' Indeed, the record in this case suggests that some faculty on the University Senate's planning committee objected to teaching so many theology and philosophy courses.

One might reply that many of these *Catholic Bishop* concerns exist whenever a church runs a non-religious enterprise, such as a hospital or a farm. *See Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985) (church-run service stations, grocery stores, a hog farm and other enterprises). Yet, philosophical, theological and church-related moral issues would seem more likely to permeate the educational process (especially how or what students are taught or counseled) than the administration of farms or even hospitals. And, here, the inculcation of religious values is at least *one* purpose of the institution. Regardless, since the Labor Board's 'entanglement problems' here are roughly the same as at the secondary level, this argument is more properly aimed at *Catholic Bishop* itself, than at our application of it.

Third, to fail to apply *Catholic Bishop* here is to undercut that opinion's basic rationale and purpose. The Court there rejected the Labor Board's pre-existing distinction between "completely religious schools" and "merely religiously associated schools." In doing so, it sought to minimize the extent to which Labor Board inquiry (necessary to make the "completely/merely-associated" distinction) would itself entangle the Board in religious affairs. Under this rationale, therefore, we cannot avoid entanglement by creating new, finely spun judicial distinctions that will themselves require further court or Labor Board 'entanglement' as they are administered. To order the Board to exclude priests from the bargaining unit; to approve its having separated the seminary from the rest of the school; to create special burden of proof rules; to promise that courts in the future will control the Board's efforts to examine religious matters, is to tread the path that *Catholic Bishop* forecloses. These ad hoc efforts, the application of which will themselves involve significant entanglement, are precisely what the

Supreme Court in *Catholic Bishop* sought to avoid.

Fourth, we do not believe that the cases on which the Labor Board relies, namely, *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973); *Roemer v. Board of Public Works,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), are determinative. Those cases all involve government *aid* to education, and its promotion of religion. In that context, one might believe it easier to target financial aid to the secular aspects of a university's mission than to those of a secondary school. Regardless, in the context of Labor Board jurisdiction, the constitutional concern is one, not of state promotion, but of state interference through regulation. However one reasons about "financial aid," from a *regulatory* perspective we cannot find a significant difference between the secondary school (particularly the "merely religiously associated" secondary school) and the college or university. Unfair labor practice charges would seem as likely; the Board's likely scrutiny would seem at least as intense; the necessary distinctions between religious and labor matters would seem no easier to make; and whether one could readily "fence off" subjects of mandatory bargaining with a religious content would seem similarly in doubt.

At the same time, it is difficult to find any unusually strong interest arising out of the Labor Act itself that calls for jurisdiction here. As the Supreme Court observed in *NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 497, 99 S.Ct. at 1317, the Board's assertion of jurisdiction over nonprofit educational institutions is a relatively recent phenomenon. Moreover, in light of *NLRB v. Yeshiva University,* 444 U.S. 672, 100 S.Ct. 856, there is no anomaly in the fact that a school may receive federal aid but its faculty cannot invoke Labor Act protection. *Yeshiva* means that many, if not most, university faculties fall outside the Act in any event, because the university affords them a degree of managerial autonomy. Hence, "federal aid without

federal labor protection" is a common circumstance. Finally, the *Catholic Bishop* Court noted that

> the Senate Committee on Education and Labor chose a college professor's dispute with the college as an example of employer-employee relations *not* covered by the Act. S.Rep. No. 573, 74th Cong., 1st Sess., 7 (1935).

*NLRB v. Catholic Bishop of Chicago,* 440 U.S. at 504–05, 99 S.Ct. at 1321.

In sum, application of *Catholic Bishop* here poses no threat to the coherence of the Labor Act. And, *Catholic Bishop*'s language, reasoning, and purposes make it applicable here. For the reasons stated, enforcement of the Board's order is

> *Denied.*

COFFIN, Circuit Judge, with whom BOWNES, Circuit Judge and BAILEY ALDRICH, Senior Circuit Judge, join.

We incorporate by reference the original majority opinion, *supra* at 383–391 (subsequently withdrawn), and add the following comments to respond to the particular approach taken by our brothers in their en banc decision.

We do not tarry long over the argument that the term "church-operated schools" in *Catholic Bishop* implies all levels of educational institutions; the mere absence of the adjective "secondary" in that phrase does not tell us much. Although "school" to us suggests schooling prior to the university level, the language is at best ambiguous.

What really divides our two panels in this en banc consideration is our differing views of the Court's rationale in *Catholic Bishop.* Our brothers see no significant difference in the risks of state/religion entanglement between the parochial secondary schools at issue in *Catholic Bishop* and *"Tilton"*-type colleges, i.e., religiously controlled universities with a predominant mission of secular education. *Tilton v. Richardson,* 403 U.S. 672, 687, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (1971). In contrast, we read *Catholic Bishop*'s basic rationale

as resting on the unique role that teachers in elementary and secondary schools play as servants of the Church in fulfilling the religious mission of the school. We view as critical the gap that separates the role of such teachers from the role of professors in a school such as Bayamon.

To review briefly the basis for our reading of *Catholic Bishop*, the Court noted that, in its recent decisions involving aid to parochial schools, it had "recognized the critical and unique role of the teacher in fulfilling the mission of a church-operated school." *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319. It observed that, in the secondary schools before it, "[r]eligious authority necessarily pervades the school system," 440 U.S. at 501, 99 S.Ct. at 1319 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 617, 91 S.Ct. 2105, 2113, 29 L.Ed.2d 745 (1971)) and, as in the schools in *Lemon*, it could not "ignore the danger that a teacher under religious control and discipline poses to the separation of the religious from the purely secular aspects of pre-college education." *Id.* Quoting from *Meek v. Pittenger*, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 17 (1975), the Court emphasized "the importance of the teacher's function in a church school: Whether the subject is "remedial reading," "advanced reading," or simply "reading"...." 440 U.S. at 501, 99 S.Ct. at 1319. It concluded its analysis by quoting Justice Douglas's remark in *Lemon* that "the *raison détre* of parochial schools is the propagation of a religious faith." 440 U.S. at 503, 99 S.Ct. at 1320.

It seems to us, therefore, that the Supreme Court was not concerned simply with general state regulation of a religious educational institution. Rather, its focus was particularly on the unique church-teacher relationship existing in parochial secondary schools. Indeed, the Court noted that its conclusion was based on the fact that the "church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school." 440 U.S. at 504, 99 S.Ct. at 1320. Because the Court saw teachers in parochial schools as essentially

servants of the Church in carrying out the religious missions of elementary and secondary schools, the Court could hold that the very *existence* of a union and mandatory bargaining in such schools would impermissibly violate this essential relationship between church and teacher. Teachers in the lower grades play such an integral role in inculcating their students with the school's religious doctrine, and play such an important role as religious models for their students, that the Supreme Court could well conclude that any state labor regulation would inevitably result in the entanglement of religion and government.

In order similarly to exempt Bayamon from NLRB jurisdiction, we deem the relevant inquiry to be whether teachers in that university play a role similar to that played by teachers in religious secondary schools. It is of critical importance to remind ourselves that we do not write on a clean slate when we engage in this analysis. On numerous occasions, the Supreme Court has stated that it perceives significant differences between church-operated elementary or secondary schools and church-operated colleges. The Court first drew this line in *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) and it has consistently adhered to it.

In *Tilton*, the Supreme Court upheld a grant of federal monies to church-affiliated universities, stating that "[t]here are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools." 403 U.S. at 685, 91 S.Ct. at 2099. The Court observed that, in contrast to the complete control over students education sought in pre-college church schools, "[m]any church-related colleges and universities are characterized by a high degree of academic freedom and seek to evoke free and critical responses from their students." *Id.* See also *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973) (college controlled by a religious organization is sufficiently secular to receive federal funds); *Roemer v. Board of Public Works*

*of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (same). Just last term, in *Grand Rapids School District of the City of Grand Rapids v. Ball*, — U.S. —, 105 S.Ct. 3216, 87 L.Ed.2d 267 (1985), the Court noted that the elementary schools it was dealing with in that case were pervasively sectarian, and stated in a footnote: "The elementary and secondary schools in this case differ substantially from the colleges we refused to characterize as "pervasively sectarian" in *Roemer v. Maryland Public Works Board*, 426 U.S. at 755–59 [96 S.Ct. at 2349–51] . . . *Hunt v. McNair*, 413 U.S. 734 [93 S.Ct. 2868, 37 L.Ed.2d 923] (1973); *Tilton v. Richardson*, 403 U.S. 672 [91 S.Ct. 2091, 29 L.Ed.2d 790] (1971)." 105 S.Ct. at 3223, n. 6. *See also Aguilar v. Felton*, — U.S. —, 105 S.Ct. 3232, 3238, 87 L.Ed.2d 290 (1985).

From the record, it is clear to us, as it is to our brothers, that Bayamon resembles the church-affiliated colleges addressed by the Supreme Court in *Tilton, Hunt,* and *Roemer*. Indeed, looking specifically at the faculty at Bayamon, we observe that they are similar to the faculty at those church-affiliated universities, and indeed to faculty at most secular universities. Under Bayamon's bylaws, the only requirements for hiring a faculty member are that the candidate "possess the appropriate academic degrees, be of a sound moral character and show traits of pedagogical qualities." (A. 296) The faculty member's functions are described as: "teaching classes, giving and grading examinations, handing in grades on time, orienting the students, participating actively in the university life, doing research work and seeking his professional development, and any others assigned by the Academic Dean." (A. 296) These criteria for hiring a faculty person and these functions required of a professor are no different from those at most universities across the country.

It is true that under Bayamon faculty regulations a professor may be terminated for "offenses to the Christian morality." (A. 311) This rule is understandable in a university that is seeking to offer its secular education under religious auspices, but it is *not*, we think, sufficient to establish that the role and character of the faculty at Bayamon is similar to the "unique role" played by teachers in parochial elementary and secondary schools as described by the Supreme Court. In a university that prides itself on providing "a humanistic education at an academic level", (A. 286) teachers are not expected to provide the intense inculcative religious experience for their students that is the norm in a religious elementary or secondary school.

Our brothers argue that it is erroneous to rely on the distinction between religious secondary schools and *"Tilton"*-type universities as established in the aid-to-school cases. They argue that the basic constitutional concern in those cases was the "promotion of religion". *Supra* at 403. By contrast, they contend that the constitutional concern in the context of labor jurisdiction is "state interference through regulation". *Id.* Thus, "[f]rom a regulatory perspective", they can find no significant difference between religious secondary schools and universities. *Id.*

We contend that *Catholic Bishop* should not be read as speaking so broadly against state interference in all religiously-controlled educational institutions. Certainly, if the Court was generally concerned with state labor regulation of religious institutions, it would be equally concerned with NLRB jurisdiction over religious hospitals and social service organizations. Our brothers assert that the "philosophical, theological and church-related moral issues would seem more likely to permeate the educational process . . . than the administration of farms or even hospitals." *Supra* at 402. We are not so sure. One of the examples of a church-related moral issue presented by our brothers would arise when a university imposes sanctions on faculty members who counsel regarding abortions. *Supra* at 401. It seems to us that doctors and nurses in Catholic hospitals may similarly counsel patients regarding the availability of abortions—particularly in those religious hospitals that do not allow the performance of abortions. Sim-

ilar situations could arise in other religious institutions. Yet, in the wake of *Catholic Bishop,* numerous courts of appeals have held that NLRB jurisdiction does extend to religiously affiliated hospitals and social service organizations. *See e.g., Volunteers of America-Minnesota-Bar None Boys Ranch v. NLRB,* 752 F.2d 345 (8th Cir. 1985), *cert. denied,* —— U.S. ——, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985); *Denver Post of the Volunteers of America v. NLRB,* 732 F.2d 769 (10th Cir.1984); *St. Elizabeth's Hospital v. NLRB,* 715 F.2d 1193 (7th Cir. 1983); *St. Elizabeth Community Hospital v. NLRB,* 708 F.2d 1436 (9th Cir.1982); *Tressler Lutheran Home for Children v. NLRB,* 677 F.2d 302 (3rd Cir.1982). These decisions are consistent with the rationale and purpose of *Catholic Bishop,* for such religiously affiliated institutions, like many religiously affiliated universities, do not pose the risk of entanglement that exists in pre-college schools where teachers play such an all-encompassing role.

Our brothers contend that, if we allow NLRB jurisdiction over a university such as Bayamon, the Board's inquiries will inevitably intrude into the religious doctrines of the university. *See supra* at 401–02. These concerns are largely speculative at the moment. Indeed, our brothers' example of an improper inquiry, *supra* at 11 (excerpt reprinted in appendix), is significantly flawed. The lawyer who, in this case, questioned church officials about liturgies was counsel for the *University,* not the Board. The questions were asked as part of counsel's extensive effort to rebut the statement of the Archbishop of San Juan that Bayamon was not a "Catholic" university, in the sense of owing fealty to the diocese—an issue deemed by the original panel to be essentially irrelevant as long as the University was controlled by some religious order. *See supra* at 387, n. 5. Further, if the Board does overstep its bounds, a court is always free to fashion a prophylactic rule similar to the one recently adopted by the Second Circuit in *Catholic High School Assoc. of Archdiocese of New York v. Culvert,* 753 F.2d 1161, 1168–69 (1985) (Board may not inquire into whether a religiously-based reason, given for a discharge, is truly part of church dogma; Board may only determine whether the reason is part of a "dual motive" for the discharge).

In sum, we believe that the differences that exist between the role of teachers in religious pre-college schools and the role of faculty at religious universities such as Bayamon mean that we should not extend the holding of *Catholic Bishop* to this case, unless virtually compelled to do so. Indeed, we believe the language, reasoning and purposes of *Catholic Bishop* guide us towards allowing NLRB jurisdiction over an institution "with admittedly religious functions but whose predominant higher education mission is to provide ... students with a secular education". *Tilton v. Richardson,* 403 U.S. 672, 687, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (1981).

### APPENDIX

The recorded testimony in this case of the Archbishop of San Juan, a Cardinal of the Catholic Church, reads:

Q. [By Mr. Garcia, University Counsel]: Your Eminence, if you know, how many liturgies are required at Universidad Central de Bayamon?

A. May I ask what will that prove?

Q. Well we are asking a question of Your Eminence that we hope you can answer. If you can't answer it just tell us you cannot.

A. Well I suppose they have liturgies, but I don't know how many.

Hearing Officer: If I may, Witness. If you know the answer you are instructed to answer. If not please state that you have no personal knowledge of whether there are any or whether they are required.

### [Colloquy]

Q. Yes, Your Eminence, we would like to know in regards to the liturgies that may be required or may occur at Universidad Central de Bayamon, if you have

any personal knowledge or if you have participated in any of them?

A. Well, first of all I don't know exactly the number of liturgies they may have at the University. I don't know exactly the number. Secondly, I don't remember having said Mass at the University itself, since it doesn't have a chapel as such. The Church nearby, which belongs to the parish; there I have said Mass. Now, I would like to add that I have said Mass in other institutions like jails and so forth and that doesn't make them Catholic.

.    .    .    .    .

Q. Do you remember if in or around November 1974 you met with President Vicente van Rooij and discussed the possibility that some of the persons working as his underlings in the administration could be fired or substituted by other persons?

A. I remember very well interceding for some priests who were bounced from the University. I disliked the way in which it was done, so I called Father Vicente and I told him my great displeasure at the way these priests had been treated.

Q. Do you remember if in or around January of 1975 you sent communications to Rome regarding your desire to have a closer and more effective power over Universidad Central de Bayamon?

A. That I have done several times. Definitely.

Q. Do you remember if in or around February, 1975 you also sent letters to Rome regarding the functions of Father Vincente van Rooij as president of the University and Maria Molinero as vice president of the University and regarding other persons in the administration of the University?

A. I may have in the same sense that I said I have certain perogatives with the priests of the Archdiocese. I may have done it. I don't remember exactly as I did it, but I may have. He is a priest of the Archdiocese, Father Vicente.

The testimony of Monsignor O'Donnell cited in the Appendix in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507–08, 99 S.Ct. 1313, 1322–23, 59 L.Ed.2d 1313 (1979), reads as follows:

Q. [by Hearing Officer] Now, we have had quite a bit of testimony already as to liturgies, and I don't want to beat a dead horse; but let me ask you one question: If you know, how many liturgies are required at Catholic parochial high schools; do you know?

A. I think our first problem with that would be defining liturgies. That word would have many definitions. Do you want to go into that?

Q. I believed you defined it before, is that correct, when you first testified?

A. I am not sure. Let me try briefly to do it again, okay?

Q. Yes.

A. A liturgy can range anywhere from the strictest sense of the word, which is the sacrifice of the Mass in the Roman Catholic terminology. It can go from that all the way down to a very informal group in what we call shared prayer. Two or three individuals praying together and reflecting their own reactions to a scriptural reading. All of those—and there is a big spectrum in between those two extremes—all of these are popularly referred to as liturgies.

Q. I see.

A. Now possibly in repeating your question, you could give me an idea of that spectrum, I could respond more correctly.

Q. Well, let us stick with the formal Masses. If you know, how many Masses are required at Catholic parochial high schools?

A. Some have none, none required. Some would have two or three during the year where what we call Holy Days of Obligation coincide with school days. Some schools on those days prefer to have a Mass within the school day so that the students attend there, rather than their parish churches. Some schools feel that this is not a good idea; they should always be in their parish

church; so that varies a great deal from school to school.

